155 So.2d 304

**PINTO ISLAND METALS CO., Inc.,**

v.

**Prince EDWARDS.**

**1 Div. 60.**

Supreme Court of Alabama.

June 20, 1963.

McCorvey, Turner, Johnstone, Adams & May, Mobile, for appellant.

Vincent F. Kilborn, Kilborn, Darby & Kilborn, Mobile, for appellee.

HARWOOD, Justice.

This is a review by writ of certiorari of a judgment of the Circuit Court of Mobile County awarding workmen's compensation to Prince Edwards.

The petitioner is the Pinto Island Metals Company, Inc., by whom Edwards was employed.

All of the elements essential to the maintenance of a claim for workmen's compensation are present or agreed upon, and the most material question presented is whether there is sufficient legal evidence to sustain the lower court's finding of fact and conclusions of law and the judgment entered pursuant thereto.

Pinto is engaged in buying and selling metals of all sorts. Bulk objects such as old ships are cut up and the metal sold for scrap.

Prince Edwards was employed as a "burner" by Pinto. As such, he used a blow torch. On 17 April 1960, he was burning the top of a metal barrel preparing to use it in breaking up some batteries for the lead therein. The barrel contained, or had contained, flammable or explosive material. It exploded and Edwards received burns and injuries of such severity that he was hospitalized from 17 April until 3 July 1960.

Prior to his injuries Edwards' wages as a burner averaged $62.00 per week. Upon his return to work for Pinto he was given work as a metals separator at identical wages. By the time of the trial he had received two 5¢ per hour raises and his weekly wages averaged $66.40. Edwards was 35 years of age at the time of trial, married, and the father of four children under 18 years of age.

During his absence from his job, Pinto paid his medical expenses of some $4,014.72, and $31.00 per week workmen's compensation for forty weeks. The present litigation arises out of Edwards' claim for additional compensation.

Edwards testified that upon the explosion of the barrel, his clothing was burned completely off "from the pockets down;" his face was burned; his left eye was knocked out of the socket, and he was otherwise injured. He was taken to the first aid station, and then to a hospital.

Dr. Leslie Heiter, Pinto's physician, was in general charge of Edwards' case, though several specialists were also called in. During his stay in the hospital, some four skin grafting operations were performed on his legs with, medically speaking, good results. His face bears some patches where the pigment is absent due to burns.

The tenor of the medical testimony as to the dermatological aspects is that in time Edwards should recover to where he would have no permanent disability.

Edwards testified that in the hospital his eyes were bandaged over and he did not know if they were burned or not. Some of the time he was unconscious.

Medical records kept by Drs. Yeager and Warren, eye specialists, show that on the day of the accident Dr. Heiter requested an examination for "laceration face—face —lid—burns of face." He was seen on that date by Dr. Yeager.

On 25 August 1959, Edwards was examined by Dr. Yeager who entered on the Yeager—Warren report: "Corneal astigmatism due to burns ??" This after a refraction test. Edwards was seen again by Dr. Yeager on 18 September 1959, and he prescribed glasses for him.

On 1 September 1960, Edwards' attorney wrote Dr. Yeager asking if he would give them a report as to the extent of vision loss suffered by Edwards.

Dr. Yeager replied to this letter on 8 September 1960, as follows:

"I first saw Prince Edwards on April 17, 1959 at Dr. Heiter's request to examine his eyes. He had facial lacerations and burns of his face which occurred when an oil drum exploded in his face. The last time I saw Prince Edwards was on September 18, 1959 at which time glasses were prescribed for him. When first seen, burns of his face and lacerations of his face had already been treated for approximately one day. There was a mild corneal irritation due to the flash burn associated with the injury. *On August 25, 1959, a refraction was done showing corneal astigmatism (sic), due to the fact that I had not examined this*

man prior to his injury, it would be impossible for me to say that the corneal astigmatism he had was due to the accident. I do not know what his vision was prior to the injury either, but assume that it must have been fairly good vision or they would not have employed him. His vision corrected was 20/40 in the right eye and 20/25 in the left.

"I think that a follow-up examination is certainly indicated in Prince Edwards' case and I will be most happy to pass any additional information on to you following that exam." (Italics ours.)

It appears that after his return to work Edwards, on 19 October 1960, got a piece of glass in his eye and upon going to the offices of Drs. Yeager and Warren, he was seen by Dr. Warren.

In his report of this examination Dr. Warren wrote that he found no real injury to Edwards' eye from this second accident. He also added to his report of this second accident the following relative to Edwards' eye injuries sustained in the explosion:

"None of the loss of vision in this patient could possibly be due to any accident which has ever occurred at the Alabama Drydock. I am confident of this since his error of refraction is due to an astigmatism and not due to corneal scarring. If the explosion that he previously had had injured his eye, there would be corneal scarring but he has absolutely none."

The next day, 21 October 1960, Dr. Warren wrote a letter to Alabama Drydock, attention insurance department, in which he stated:

"It is my opinion and confirmed by consultation this morning with Dr. J. R. Hays that this corneal astigmatism has been present for many, many years and could not possibly be due to the accident since there is absolutely no corneal scarring. Some of this astig-

matism is actually inside the eye in the patient's lens particularly in the right eye. The patient's somewhat diminished vision is due to his marked astigmatism, both corneal and lens and not due to any corneal scarring from any accident.

"The patient was extremely well healed today showing even under the microscope absolutely no corneal staining and absolutely no corneal scars in either eye. Therefore, there can be no possibility of any loss of vision from the accident incurred on October 19, 1960."

Dr. Warren testified as a witness for Pinto in the proceedings below, and the tenor of his testimony is fairly well illustrated by his reports above. He testified that he made a microscopic examination of Edwards' eyes on 21 October 1960, which was the only time he saw Edwards, and found no corneal scarring. The cornea is the transparent structure forming the front of the eyeball, while the lens is inside the eye. Finding no corneal scarring, Dr. Warren was positive in his opinion that the corneal and lenticular astigmatism which he observed in Edwards' eyes could not have resulted from the explosion, but was a condition existing from birth with a tendency to progress with age.

On cross examination Dr. Warren testified that the records of the examination of Edwards' eyes in August 1959, showed that his vision in his right eye was 20/400 correctible to 20/40, but in October 1960, it was correctible to 20/70, and this indicated a lessening in vision. Dr. Yeager's chart showed that in November 1960, the right eye was correctible to 20/200, and the left eye to 20/40.

It is also to be noted that in his report to the Alabama Drydock following his examination of Edwards in October 1959, Dr. Warren stated: "There is a vatreous band in the right eye extending to the macula which may very well at some future date cause a retinal detachment."

It further appears that in reply to an additional letter written by counsel for Edwards, Dr. Yeager, on 22 November 1960, wrote the following letter:

"I have your letter of September 1 before me at which time it was requested that I see Prince Edwards of 208 Yost Street, Prichard, Alabama. I advised that if he would send him in that I would be most happy to see him. When he came into the office, he was seen by Dr. Warren. This unbeknownst to me, and Dr. Warren did not know that he was supposed to write up a report. He was seen by Dr. Warren on October 20, 1960 in which he stated 'I am confident that his error in refraction is due to an astigmatism and not due to corneal scarring.' He further stated that 'If the explosion that he previously had had injured his eye, there would be corneal scarring, but he has absolutely none.'

"This supports my prior impression that he is suffering from astigmatism, rather marked of the lens. The lenticular astigmatism could not have been caused by the accident.

"The fundus is readily available in each eye and appears normal. Some difficulty is met with in this examination due to the previously mentioned lenticular astigmatism. Glasses were prescribed yesterday which are of a mixed astigmatic type lens bilaterally. His vision by these glasses was corrected from 20/400 and 20/200 to 20/200 and 20/40, right and left eyes respectively.

"According to your request regarding further injury of his eyes three weeks ago, there is nothing in the way of a residual which would be of any injury from that accident.

"As to prognosis, I see no reason why his vision will not remain approximately the same."

It might be noted that Dr. Warren mentioned in his testimony that this letter con-

firmed his views, and was a retraction of Dr. Yeager's earlier finding of corneal astigmatism, particularly when considered in light of the question marks appearing in Yeager's earlier diagnosis for corneal astigmatism. Yeager's full report at this time makes questionable whether the question marks were used because of doubt of his diagnosis, or because never having seen Edwards before he could not say positively the corneal astigmatism he found resulted from the explosion. It is also to be noted that Yeager, in his second letter does not repudiate his earlier finding of corneal astigmatism, but only states that the lenticular astigmatism could not have been caused by the explosion.

Prince Edwards testified in his own behalf in the court below. The tendencies of his testimony are reflected in the court's findings. As to the injuries to his body, the court made the following findings:

"In the treatment of the burns from the waist down it was necessary to perform multiple skin grafts consisting of placement of postage size patches of skin taken from donor areas along the thighs and transplanted to the legs. The Court had the employee taken to a jury room adjacent to the Court Room and completely stripped. The Court therefore had benefit of a complete visual examination of all the affected areas of this man's body and the resultant permanent conditions and effects of the skin grafting. Burned areas about the face were in a healed condition with considerable cosmetic change from the unburned facial areas. The knees and below on both legs and to the top of the feet appear rough and crinkled much as the Court would describe surface areas of elephant hide. The effects of the skin graft are permanent itching and burning sensations. Medically speaking, the skin grafts are satisfactory. There is no edema. There is tightness sensation in the graft areas. Other burned areas where no skin graft was performed are dis-

colored and noticeable but do not appear to impair the employee in use of his back or shoulders.

"There is atrophy in the muscle of the right. leg. The employee walks with a limp and is unable to stoop without either losing or tending to lose his balance. While X-rays taken of both right and left knees do not reveal any bone abnormality they, of course, do not show negative tissue damage. The employee in his present job finds it necessary to sit at frequent intervals. He is unable to stand for long periods of time. No difficulties whatever had been experienced by the employee prior to the injury. The conditions described above are now fixed and permanent and directly result from the injuries sustained in the explosion."

As to the injuries to Edwards' eyes the court found:

"The most severe damage has been occasioned to the eyes. Edwards described himself as being knocked crazy by the explosion. His recollection was that one eye was completely displaced from its socket and had to be reseated. The other one was badly burned so he states. Injury to the left eye and severe burning of the right were confirmed by Dr. Heiter's recollection.

"Prior to the accident, Edwards had never worn glasses or experienced any trouble whatever with his eyesight; since the accident, the vision in the right eye has been 20/400, a condition characterized by Dr. Claude Warren as industrial blindness. Since the accident, vision in the right eye was correctable with glasses to 20/40 in August 1959, to 20/70 in October 1960 and degenerated to 20/200 by November 1960. Vision in the left eye is 20/200 without glasses and has been correctable to 20/40 in the left eye. These figures are figures as of last eye examination given Edwards by the Company physicians November 1960. Glasses were changed

during this period twice. Edwards testified he is going completely blind. Demonstrations were made in the court room of the ability of the petitioner to distinguish features, colors, individuals, motions and the like. Based upon the observations made by the Court of these demonstrations in the court room, it is manifest that the employee's eyesight is substantially blindness in legal effect in the right eye without glasses and is little improved by glasses there. While somewhat better sight exists in the left eye the Court finds that the degree of vision is steadily deteriorating in this eye as well. The Court finds therefore that there is a permanent condition of rapidly diminishing eyesight in both eyes and substantial blindness in the right eye at present."

On certiorari to review judgments in workmen's compensation cases, this court does not look to the weight of the evidence, but we examine the evidence to see if there is any evidence to support the facts found by the trial court. See Ala.Dig., Work. Com., ☜1940, for innumerable authorities.

It is our conclusion that there is evidence in this record supporting the finding of the trial court.

Counsel for petitioner argues strenuously that the trial court admitted and considered illegal testimony. In this connection the record shows that over the objection of the petitioner here, the trial court permitted Edwards, on direct examination, to testify in response to a question seeking to elicit such testimony: "Well right now I would say as far as manual labor is concerned, I would say about 75% of what I could do I can't do now."

We pretermit whether this testimony of Edwards, a lay witness, was improper because pertaining to the ultimate issue to be decided by trial court, that is, the percentage of his disability. This for the reason that on certiorari to review

**356**

workmen's compensation judgments, the trial court's findings will not be disturbed because of admission of improper evidence where there is sufficient legal evidence to support the judgment rendered. Majors v. Jackson Lbr. Co., 244 Ala. 418, 13 So.2d 885; Malbis Bakery Co. v. Collins, 245 Ala. 84, 15 So.2d 705.

Stripped of this illegal evidence, there is sufficient legal evidence to support the judgment.

Further, in workmen's compensation proceedings expert's opinions are not conclusive on triers of facts even though uncontroverted. Benson-Jackson-Mathers Post No. 5106 v. Donaldson, 267 Ala. 60, 99 So.2d 688, and cases cited therein.

Counsel for petitioner further argues that the undisputed evidence shows that Edwards suffered no loss of earning capacity as a result of the injuries received in the explosion, and the court's judgment based on 75% total permanent disability is erroneous.

Counsel argues that Section 279(C)6, of Title 26, Code of Alabama 1940, prescribes the award for non-scheduled partial permanent disability and sets the same at "the difference between the average weekly earnings of the workman at the time of the injury and the average weekly earnings he is able to earn in his partially disabled condition."

The court found that Edwards' most severe injuries were to his eyes. This being so, Section 279(C)6, supra, does not determine the award. For partial permanent disability to sight the award is governed by the provisions of Sec. (D) and (C)3 of Section 279, supra, considered in connection with Sub. Sec. (C) of Section 279. Consolidated Coal Co. v. Dill, 248 Ala. 5, 26 So.2d 88; Swift & Co. v. Rolling, 252 Ala. 536, 42 So.2d 6.

Affirmed.

LIVINGSTON, C. J., and SIMPSON and MERRILL, JJ., concur.