196 So.2d 380

**KROGER COMPANY**

v.

**Elnora MILLSAP.**

**8 Div. 170.**

Supreme Court of Alabama.

Feb. 23, 1967.

Eyster & Eyster, Decatur, for appellant.

Powell & Powell, Decatur, for appellee.

## PER CURIAM.

This is a review by writ of certiorari of a judgment of the Circuit Court of Morgan County, Alabama, awarding workmen's compensation to Mrs. Elnora Millsap.

The petitioner-appellant is the Kroger Company, a Corporation, by whom Mrs. Elnora Millsap was employed.

As we view appellant-defendant's brief and argued assignments of error, the central theme of this appeal pivots on whether or not the evidence supports the trial court's factual finding that plaintiff-appellee sustained a seventy-five per cent permanent and partial disability when she sustained an injury proximately caused by an accident that arose out of and in the course of her employment. There is no contention that she was not accidentally injured while so employed, but the extent of such injury resulting in permanent and partial disability with judgment therefor is the central issue on this appeal.

There are some satellite contentions of error which may be resolved against appellant if the trial court was correct in its factual finding that plaintiff suffered a seventy-five per cent disability as above noted.

It appears from the evidence without dispute that plaintiff had been in the uninterrupted employment of defendant for a period of five years immediately prior to March 9, 1962, and part time for a period of two years immediately preceding the five-year employment period.

Plaintiff was, on March 9, 1962, and for some time prior thereto, rendering service in the meat department of defendant, and while so serving, it was her duty to move by physical effort metal trays of meat. While moving several of these trays at one time, probably weighing thirty pounds, she suffered, as she stooped over, a severe pain in the lower region of her back.

The pain was so severe that she became pale and nauseated. One of her fellow

employees took her by automobile to the office of the company physician, Dr. Barrett, a general practitioner, who has had a special interest in gynecology and female neurology for a number of years.

After observing and treating plaintiff regularly for about six weeks, Dr. Barrett referred her to Dr. Beddow, an orthopedic specialist. Dr. Beddow observed and treated her at regular intervals until June 19, 1962, when treatment was suspended.

Dr. Barrett testified that a physical examination of Mrs. Millsap revealed considerable spasm of the large muscle groups which grow up and down the spine on both sides. This muscle spasm prevented free motion of the spinal column. These spasms were more severe in the lower spine. She was tender under pressure in that area. "In the examination and on X-ray examination it indicated she had had a severe strain of the muscles and ligaments, particularly of the lower spine as they are fastened on to the bones in the lower spine and pelvis."

Dr. Barrett concluded, after consultation with Dr. Beddow, that the X-rays revealed that Mrs. Millsap has "a congenital malformation of the lower back, in that the fifth lumbar vertebra is fused on to the sacrum, or pelvis bone; and the fourth vertebra, due to the apparent straining of the back, had slipped forward slightly, causing what we call a spondylisthesia (sic), making a constant strain on the portions of the bone which articulare (sic) one with the other to hold the bones together. In addition, there were some early changes of arthritis where the bones come together, showing some arthritic changes had occurred."

Also, witness testified to some other physiological ailments not connected with the muscle spasm for which he treated her during the six-week period.

Witness further testified:

"Q. What in your opinion was it [muscle spasm] attributable to?

"A. It was attributed to the strain of those muscles and ligaments in the incident in which, I believe, it was metal trays she had stooped over to handle.

\* \* \* \* \* \*

"Q. Do you have any judgment about the injury to this back that you are testifying about,—the pain she complained of, would it be associated with an injury such as she sustained on March the 9th?

"A. Yes, it certainly can.

"Q. Would that be,—can you describe the type pain you would expect from an injury to the lower back such as she had, that you saw evidence of?

"A. It can be anything from a very minor aching and slight discomfort, on up to very severe pain on any movement whatsoever of the lower back. In other words, it varies very, very widely as to severity.

"Q. As I understood your testimony, your x-rays revealed she had some malformity of the structure of the lower back?

"A. That is correct.

"Q. Do you have a judgment about the extent of it timewise,—how long it was?

"A. It's a congenital thing, which means she was born with it,—had it all her life, which produces a certain element of weakness in the lower back, which makes it more subject to strain than a normal back would be.

"Q. Would a back having that condition, without examination revealing it, have any symptoms till a patient got an injury to that area that warned her of it?

"A. No, none whatever.

"Q. Then you might have a given number of persons that might have this same condition and go through life without knowing it?

"A. That might be true.

"Q. And if they got an injury to this area would that aggravate the condition from the standpoint of both pain and recovery?

"A. It would.

\* \* \* \* \* \*

"Q. Would this patient, in your opinion, always have a weak back as the result of this accident?

"A. I think she would, yes.

"Q. Do you believe, Doctor, that she could work in a position or anywhere and do the type of work she related to you she was doing at the time she was injured, in the future?

"A. My opinion is that she would be unable to do that type work.

"Q. Permanently?

"A. Possibly permanently, unless the condition was corrected by surgery, and I am not an orthopedist, and I wouldn't want to venture a statement as to how successful that particular treatment would be from surgery."

Dr. Beddow testified that he first saw plaintiff as a patient on May 2, 1962. She gave a history that she had had back trouble for three years, and had had some of this pain at least a week out of a month since that time, and that doing work at Kroger's grocery, lifting and bending, had made the pain more severe.

In laymen's speech, the witness testified:

"She had an abnormal low back, which would lead to a weakened low back. The sacrum is supposed to be (that is the lower portion of the back, at the pelvis), —is supposed to be one bone. There are five segments growing together making the bone. The first of those segments wasn't grown together; it was partly separated, and contact between the movable part of it, which resulted in traumatic arthritis.

\* \* \* \* \* \*

"Q. Did you find evidence of recent injury to that area of her back?

"A. Not on x-ray. \* \* \* I was convinced she had pain there, and this could be caused by injury or aggravated by injury.

"Q. Did you find evidence of any recent injury to that area?

"A. Not objective, except for the muscle spasm and soreness.

"Q. Did you find muscle spasm present?

"A. Yes, there was some. I didn't mention it here (using notes).

"Q. Was the area you are discussing what we call tender when you press it, or under pressure?

"A. Yes, sir.

"Q. Did that indicate she might have had an injury in that area of her back?

"A. It could have been caused by it. Let's say it could have been aggravated by injury. She had back trouble long before we are talking about here.

"Q. Is it your opinion, Doctor, that she had this abnormal condition in her lower back for many years, maybe born with it?

"A. Yes, sir.

"Q. Assuming they have never had an examination or x-ray, is it correct to state a person might have this condition she had, and not know it till they were injured in that area of the back?

"A. Not know it till they were examined,—yes, sir."

It appears that plaintiff went back to work for defendant in its meat department, in the fall of 1962, with the approval of Dr. Barrett. She performed the same duties as before, and worked for about six months. She got a renewal of the same injuries and pain that happened during her former

employment. She went back to Dr. Beddow, who testified with respect to the second episode, in part, as follows:

"Q. THE COURT: What about the last time you saw her? [Referring to the second episode]

"A. She hadn't gotten over it as much as she had the first time. She doesn't now wear her brace; doesn't do much of anything, so now she is more disabled than before, than she was in '62. She has two strains now.

"Q. THE COURT: You think she got another one from going back to work?

"A. Yes, she went to doing the same thing she had before, and did the same thing she did before.

"Q. So that got her in worse condition than after the first episode?

"A. Yes.

"Q. THE COURT: What is her disability now?

"A. It's the same injury as she had before; I guess we'll have to call it twenty now.

"Q. In your opinion it would have to be doubled?

"A. Yes, the same injury.

"Q. It was the same thing as she had before, but she has got it again?

"A. Yes, sir.

"Q. THE COURT: When you say twenty percent disability, is that considered twenty percent, she can do twenty percent of what a normal person can do, or do you take into consideration other factors other than using a normal person as a standard?

"A. We have to, because there are certain things she could do. She can do a sedentary job. She can't do anything requiring lifting or bending.

"Q. And whether she is working in a meat department, doing the tasks there required or doing similar type work in some other vocation. * * *

"A. Anything requiring lifting or bending, or working over her head. She couldn't do work over her head."

Plaintiff testified that she was 38 years old at the time of the trial; that she had a formal education through the ninth grade, and that she had no other education, training or experience. She also testified that she never before had experienced that kind of pain. She further testified that when she returned to work at Kroger's (and during the time of such employment from November 1962 until May, 1963), she had constant pain in her lower back and hips, and after she stood up for an hour or two at the time, or sat down for the same length of time, it would hurt her to the extent that she had a chill; that after going back to work, her back began to hurt more, and after working for about six months, her back began to hurt worse. She testified that prior to the injury she was able to do all her household chores, however, after the injury, she was not able to do all her household work, and had to hire ironing and heavy work done; that everything she does hurts her, but she does it anyway; that if she stands or walks for an extended period of time, it hurts more than it would otherwise. Plaintiff reaffirmed that she had not had any trouble with her back until she was injured on March 9, 1962. This testimony was in conflict with some of Dr. Beddow's testimony as to what she told him in giving a history of her trouble.

■ We will not burden this opinion with more of the testimony that the trial court heard ore tenus and which we have read, but suffice it to say, the percentage of partial and permanent disability was an issue arising from the evidence that was addressed to the trial court.

This Court has often pointed out that the Workmen's Compensation Act, being remedial in nature, should be given a liberal construction to accomplish the beneficent purposes. We have further held that the act must be liberally construed and all reasonable doubts resolved in favor of the employee. Hamilton Motor Company v. Cooner, 254 Ala. 422, 47 So.2d 270(4, 5). We also observed in Ex parte Coleman, 211 Ala. 248, 100 So. 114(5), that the liberality of construction, supra, does not mean that the rule as to the measure of proof, or the sufficiency of the evidence, is different from the rule in ordinary cases. The burden is on the plaintiff to reasonably satisfy the trial court that the accident arose out of and in the course of the workman's employment, and, when there is any substantial legal evidence to support the finding of the trial court, the judgment, whether affirmative or negative, will not be disturbed on appeal.

On certiorari to review judgments in workmen's compensation cases, the Court does not look to the weight of the evidence, but we examine the evidence to see if there is any evidence to support the facts found by the trial court. Pinto Island Metals Co. v. Edwards, 275 Ala. 351, 155 So.2d 304(1). See 19A Ala.Digest, Workmen's Compensation, ☞1940, for innumerable authorities.

Furthermore, in workmen's compensation proceedings, experts' opinions are not conclusive on triers of facts even though uncontroverted. Benson-Jackson-Mathers Post No. 5106 v. Donaldson, 267 Ala. 60, 99 So.2d 688(4); Pinto Island Metals Co. v. Edwards, supra, (5).

It is our conclusion from our review of the record that there is sufficient evidence supporting the findings of the trial court. We are unwilling to disturb these factual findings. We might add that the opinion of the trial court is elaborate and comprehensive, and indicates thoughtful and considered study of the evidence and the law pertinent to the issues presented by the pleadings in this case.

The evidence supports the contention of appellee that the congenital impairment of her back was latent and dormant when she first undertook to transfer the metal trays containing meat products and when she put them down. The medical witness testified that such latent condition could exist. Plaintiff testified that she had not had any trouble with her back prior to the occasion of such transfer of the products.

Section 288, Title 26, Code of Alabama 1940, provides:

"If the degree or duration of disability resulting from an accident is increased or prolonged because of a pre-existing injury or infirmity, the employer shall be liable only for the disability that would have resulted from the accident had the earlier injury or infirmity not existed."

With reference to the application of the above statute, and also of Section 279(E), subd. 1, of similar import, we observed in Ingalls Shipbuilding Corp. v. Cahela, 251 Ala. 163, 36 So.2d 513(4–6), as follows:

" * * * We have noted section 4276, General Statutes of 1923, is much like our section 279(E), subd. 1, supra, relating to a previous disability or injury, but none as to a previous infirmity, using that term, as in section 288, supra. We do not know the source of that provision of the Act. As said in our cases with reference to this question, we have no doubt but that an accident is compensable though it operates upon a diseased condition, latent or patent, if without such disease it would have caused a compensable disability and is otherwise subject to the Act. But our inquiry is to what extent it is compensable in the light of sections 288 and 279(E), subd. 1, supra. We must give those statutes effect. We find no cases referring to such provisions. It is our view that they do not refer to latent conditions which may not spring into activity during the compensable period, and at the time of the accident

are causing no apparent physical effect on the health or activity of the employee. We think the term disability in section 279(E), subd. 1, and infirmity in section 288, supra, refer to a condition which affects his ability to work as a normal man at the time of and prior to the accident, or which would probably so affect him within the compensable period. * * *"

■ According to substantial evidence of plaintiff, the congenital defect in her back did not demonstrate itself prior to her injury on March 9, 1962. According to medical evidence, supra, this defect might not have demonstrated itself during a compensable period except for the alleged injury. The trial court had before it sufficient evidence to justify its conclusion that the latent defect sprang into activity on March 9, 1962, and not before.

We wish to observe that the plaintiff is a woman of limited education, and has no training or experience in any specialized field of occupational activity. In all probability, she cannot go out and get work that does not require some measure of strain on her back as she could were she better educated or trained for an occupation that requires largely mental guidance.

■ The trial court in determining the amount of disability suffered by plaintiff should, and did, take these factors into consideration, and rightly did not conclude that appellee could go out and pick up work or follow an occupation that is free of physical strain on her back. We do not think the trial court in determining the degree of disability engaged in conjecture or guesswork, but in our opinion, based the fixation on sound judgment that took into consideration plaintiff's limited education which circumscribed her occupational reach.

Appellant also invites our consideration of Assignment of Error No. 12, which is as follows:

"12. The Trial Court erred in that there is a fatal variance between the allegations of the complaint respecting the date of injury for which compensation is claimed and the proof concerning same."

It appears to us that the original activation of the latent congenital anomaly caused by this first episode of work had never subsided when plaintiff was forced to forego further employment by defendant. Plaintiff testified, which we have noted, supra, that during the entire period of the second episode of work (from November 1962 to May, 1963), she had constant pain in her lower back and hips that was painful. This evidence is consonant with the medical testimony that she would be unable to do any type of work of the kind she was doing during the first period of employment.

■ We cannot see that there is any variance from the allegations in the complaint that plaintiff was injured on March 9, 1962. The efforts of plaintiff to work again at the same employment, despite the pain she testified she was suffering, demonstrates that she was not a malingerer, but was faithfully trying to work in spite of the physical handicap. She is not to be penalized for faithful efforts. We might observe here that the trial court did not allow compensation for the time plaintiff was employed the second time.

We have considered all the argued assignments of error and hold that they have no merit. We, of course, have pretermitted consideration of assignments of error not argued.

The judgment of the trial court is affirmed.

The foregoing opinion was prepared by B. W. Simmons, Supernumerary Circuit Judge, and was adopted by the Court as its opinion.

Affirmed.

LIVINGSTON, C. J., and LAWSON, GOODWYN and COLEMAN, JJ., concur.