859 So.2d 1138 (2000)
Bobby Wayne WALDROP
v.
State.
CR-98-2316.
Court of Criminal Appeals of Alabama.
June 30, 2000.
Opinion on Return to Remand December 1, 2000.
Rehearing Denied March 23, 2001.
*1144 Kathleen B. Morris, Montgomery, for appellant.
William H. Pryor, Jr., atty. gen., and James R. Houts, asst. atty. gen., for appellee.
FRY, Judge.
The appellant, Bobby Wayne Waldrop, was convicted of three counts of capital murder: two counts of murder committed during a robbery in the first degree, see § 13A-5-40(a)(2), Ala.Code 1975; and one count of murder wherein two or more persons are murdered pursuant to one scheme or course of conduct, see § 13A-5-40(a)(10). The jury, by a vote of 10-2, recommended that Waldrop be sentenced to life imprisonment without the possibility of parole. The trial court overrode the jury's recommendation and imposed the death sentence.
We note at the outset that the sentencing order contains several errors that may affect the trial court's imposition of the death sentence; therefore, we will provide only a brief recitation of the evidence presented at trial, address only the issues relating to the sentencing order, and pretermit discussion of the remaining issues raised by Waldrop on appeal until we have received a new sentencing order. Cf. Coral v. State, 628 So.2d 954, 973 (Ala.Cr.App. 1992), aff'd, 628 So.2d 1004 (Ala.1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1387, 128 L.Ed.2d 61 (1994).
Testimony presented at trial indicated that Waldrop and his wife Clara Waldrop resided with Waldrop's grandparents, Sherrell and Irene Prestridge. Sherrell had heart and hip problems and had difficulty walking. Irene was bedridden and blind and suffered from diabetes. Because of Sherrell's and Irene's infirmities, the *1145 living room of their house had been converted into a bedroom with two hospital beds where they slept. Testimony indicated that Waldrop knew that Sherrell and Irene received their Social Security checks on the first and the third of each month.
At some time between 10:30 a.m. and 2:00 p.m. on April 5, 1998, Waldrop and Clara left the Prestridge's house and checked into a hotel in Anniston. At 1:00 p.m. that same day, Clara and Waldrop pawned Sherrell's lawn mower. That afternoon Waldrop smoked an undetermined amount of crack cocaine.
During the evening of April 5, Clara and Waldrop returned to the Prestridge's house. Testimony indicated that Waldrop was not high when he returned to the house. While in his grandparents' bedroom, Waldrop and Sherrell began arguing about money. Waldrop stabbed Sherrell with a knife, and a scuffle ensued. Waldrop cut Sherrell's throat and attempted to choke him. Because Sherrell appeared to be breathing, Waldrop continued to stab Sherrell several times. In a statement Waldrop made to the police, which was introduced at trial, Waldrop stated that "[i]t looked like [Sherrell] was suffering." (C. 182-84.) After Waldrop stabbed Sherrell in the back, he appeared to stop breathing. Testimony indicated that Irene was screaming loudly throughout the incident.
After killing Sherrell, Waldrop went outside and removed gloves from the trunk of his car. Waldrop returned to the house and instructed Clara to kill Irene. Both Waldrop and Clara then put on gloves.
Clara cut and stabbed Irene approximately two times. Waldrop grabbed the knife Clara had in her hand, put a pillow over Irene's face, and stabbed Irene in the chest and the throat. During a videotaped statement, Waldrop stated that, before he stabbed Irene, she told him that she loved him. Additionally, a statement Christy Waldrop, Waldrop's sister, made to the police revealed that Waldrop had told her that, during the incident, Irene told Sherrell that she loved him and that she would see him in heaven. (R. 862-63.)
After the killings, Waldrop went into the bathroom and cleaned off the blood. Waldrop instructed Clara to take Sherrell's wallet. Clara took the wallet out of Sherrell's back pocket and put it in her purse. Waldrop put the clothing he was wearing during the killing and the knives in a plastic bag, and he and Clara left the house. Waldrop threw the bag into the river.
Gregory Wanger, a forensic pathologist, testified that he performed autopsies on the bodies of Sherrell and Irene Prestridge. Wanger stated that Sherrell sustained 43 stab and cut wounds to the head, neck, back, and chest, and that Irene sustained 38 stab and cut wounds, including wounds to the heart and lungs.
Dr. Tackett, a professor of pharmacology and toxicology, testified concerning the addictive nature of crack cocaine. Dr. Tackett stated that, in his opinion, Waldrop was addicted to cocaine. According to Dr. Tackett, he believed that Waldrop was craving crack cocaine at the time of the killings, and that Waldrop killed his grandparents in an effort to obtain money to acquire more crack cocaine. Dr. Tackett stated that, in his opinion, using crack cocaine creates a strong craving for more crack cocaine, and the acquisition of more cocaine can become the dominant goal in an addicted person's life.

I.
Waldrop contends that, in sentencing him to death, the trial court improperly considered criminal activities that had not resulted in a conviction. (Issue II(B)(i) in *1146 Waldrop's brief to this Court at p. 60.) Waldrop argues that, after the jury voted 10-2 to recommend a sentence of life imprisonment without parole, the trial court improperly relied on Waldrop's history of drug activity before and immediately following the commission of the murders, and on his theft of his grandfather's lawn mower earlier on the day of the murders to sentence him to death.
In support of his argument that the trial court improperly considered this prior criminal activity, Waldrop points to the following statement in the trial court's sentencing order:
"Insofar as this Court is concerned, the defendant has no significant history of prior criminal activity; and the Court finds this to be a mitigating circumstance, albeit a weak one. The defendant testified to commission of criminal activity in the form of purchasing, possessing, smoking, and distributing crack cocaine during the time prior to and immediately following commission of the capital offenses. The evidence shows that he stole a lawn mower and pawned it on the day of the killings. The clear evidence of significant criminal activity for which the defendant was not convicted undermines any real weight for this mitigating circumstance."
(C. 166.) (Emphasis added.)
In Cook v. State, 369 So.2d 1251 (Ala. 1978), the Alabama Supreme Court addressed a similar issue. In Cook, the Court stated:
"We also find error in the trial court's application of one of the enumerated mitigating circumstances, `(1)The defendant has no significant history of prior criminal activity.' The key word in this provision is significant. Thus the trial judge erred when he determined that Cook had no significant history `but he does have a history' and proceeded to detail Cook's criminal background in his findings of fact. The legislature has indicated that lack of a significant criminal history should operate in a convicted individual's favor. A court cannot qualify this provision by relying on prior criminal activity which does not rise to the level established by the legislature."
369 So.2d at 1257. (Emphasis in original.) In Cook, the Court further stated, "This fundamental tenet of our system of justice prohibits use against an individual of unproven charges in this life or death situation." 369 So.2d at 1257.
"Only convictions can negate the statutory mitigating circumstance of no significant history of prior criminal activity. § 13A-5-51(1), Ala.Code 1975; Freeman v. State, 651 So.2d 576, 597-98 (Ala. Crim.App.1994)." Ex parte Burgess, 811 So.2d 617, 623 (Ala.2000). See Parker v. State, 587 So.2d 1072, 1098 (Ala.Cr.App. 1991) (rejecting the mitigating circumstance of no prior criminal activity on the ground that the defendant had used illegal drugs was improper); Hallford v. State, 548 So.2d 526, 544 (Ala.Cr.App.1988) (testimony that the defendant had had an incestuous relationship does not rebut the mitigating circumstance of no prior criminal activity); Freeman v. State, 651 So.2d 576, 598 (Ala.Cr.App.1994) (where a defendant had a juvenile record, but did not have a significant adult criminal record, rejecting the mitigating circumstance of no prior criminal activity was error).
The statements in the trial court's order reflect that the trial court improperly relied upon Waldrop's alleged criminal activity which did not result in convictions to provide a basis for sentencing him to death. Although the trial court determined that Waldrop did not have a significant criminal history, it concluded that this *1147 mitigating circumstance would carry little weight when Waldrop's criminal activities that had not resulted in convictions were considered. Because the trial court accorded less weight to the mitigating circumstance by considering Waldrop's activities which did not result in convictions, this cause must be remanded for the trial court to reweigh the mitigating and aggravating circumstances and to give this mitigating circumstance the appropriate weight.
In Davis v. State, 718 So.2d 1148 (Ala. Cr.App.1995), aff'd, 718 So.2d 1166 (Ala. 1998), cert. denied, 525 U.S. 1179, 119 S.Ct. 1117, 143 L.Ed.2d 112 (1999), the trial court, in finding that the statutory mitigating circumstance of no significant history of prior criminal activity did not exist, improperly considered juvenile adjudications. However, this Court determined that in light of the fact that Davis had several misdemeanor convictions and one felony conviction, the mitigating circumstance was sufficiently negated. This Court concluded that in light of Davis's criminal record and the trial court's consideration of that record, any error in the trial court's considering Davis's juvenile record as part of his history of criminal activity was harmless.
We have likewise conducted a harmless error review in this case. See Rule 45, Ala.R.App.P.; Ex parte Whisenhant, 482 So.2d 1241 (Ala.1983)(harmless error rule applies in penalty phase of capital cases). The jury, by a vote of 10 to 2, recommended that Waldrop be sentenced to life imprisonment without the possibility of parole. The trial court found the existence of two aggravating circumstances that the capital offense was committed while Waldrop was engaged or was an accomplice in the commission of, or an attempt to commit, or flight after committing, or attempting to commit a robbery, see § 13A-5-49(4), Ala.Code 1975, and that the capital offense was especially heinous, atrocious, or cruel compared to other capital offenses, see § 13A-5-49(8), Ala. Code 1975. In addition to finding that Waldrop did not have a significant criminal history, the trial court found the existence of the mitigating factors that Waldrop's capacity to conform his conduct to the requirements of the law, and that Waldrop was 19 years old at the time of the offenses. See § 13A-5-51(6) and (7), Ala. Code 1975. Unlike Davis, when the court in this case considered Waldrop's prior criminal history, it had no prior convictions before it. In light of the Alabama Supreme Court's holding in Ex parte Burgess, supra, we cannot conclude beyond a reasonable doubt that the trial court, in rejecting the mitigating circumstance that Waldrop had no significant history of prior criminal activity, did not improperly rely on Waldrop's criminal activities that had not resulted in convictions. Cf. Lawhorn v. State, 581 So.2d 1159, 1177 (Ala.Cr.App. 1990), aff'd, 581 So.2d 1179 (Ala.1991), cert. denied, 502 U.S. 970, 112 S.Ct. 445, 116 L.Ed.2d 463 (1991).
Although we are reluctant to remand this cause, we do not believe the trial court's finding will withstand the rigors of appellate review.

II.
Waldrop contends the trial court's determination that the deaths were especially heinous, atrocious, or cruel compared to other capital offenses was not supported by the evidence. (Issue II(A)(ii) in Waldrop's brief to this Court at p. 57.)
Initially, we note that the trial court's instruction to the jury defining the aggravating circumstance that the capital offense was especially heinous, atrocious, or cruel was an accurate statement of the law; therefore, we presume that the trial court applied the proper law in finding *1148 that this aggravating circumstance existed. See Ex parte Slaton, 680 So.2d 909 (Ala. 1996), cert. denied, 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 680 (1997) ("trial judges are presumed to know the law and to follow it"). See also Maples v. State, 758 So.2d 1, 50 (Ala.Cr.App.1999).
In its sentencing order, the trial court stated:
"The capital offense was especially heinous, atrocious, or cruel compared to other capital offenses. The State proved this to be an aggravating circumstance. The defendant and his co-defendant entered the victims' home, stabbed the victims and slit the victims' throats. He repeatedly stabbed and cut both victims. He killed his grandfather by stabbing him to death in the presence of his grandmother. He then killed his grandmother by repeatedly stabbing and cutting her. He unnecessarily inflicted physical and psychological pain on both victims. He chose the method of killing and deliberately carried it out. The Court finds that the actions of the defendant were cruel and unusual and that they were intended to inflict pain on the victims. The crime was objectively atrocious."
(C. 165.)
This Court has "consistently defined `heinous, atrocious, or cruel' to include only `those conscienceless or pitiless homicides which are unnecessarily torturous to the victim.'" Ex parte Clark, 728 So.2d 1126, 1138 (Ala.1998), quoting Lindsey v. Thigpen, 875 F.2d 1509 (11th Cir.1989) (quoting Ex parte Kyzer, 399 So.2d 330, 334 (Ala. 1981)). See, e.g., Godbolt v. State, 546 So.2d 982, 991 (Ala.Cr.App.1986) (trial court's finding that the offense was especially heinous, atrocious, or cruel was supported by the evidence where victim "witnessed the killing of his wife immediately prior to his demise"), remanded on other grounds, 546 So.2d 991 (Ala.1987); Ex parte Ford, 515 So.2d 48, 52 (Ala.1987) (in determining that evidence established that a murder committed during a burglary was especially heinous, atrocious, or cruel, the trial court noted that the 74-year-old arthritic victim "watched helplessly as [the defendant] killed her daughter ... [and] then turned on [her], killing her in much the same fashion"). See also Norris v. State, 793 So.2d 847, 864 (Ala.Cr.App.1999) (listing factors considered to be indicative of an offense that is "especially heinous, atrocious, or cruel," including: (1) physical violence beyond that necessary to cause death; (2) appreciable suffering after the assault; and (3) psychological torture).
The record overwhelmingly supports the trial court's finding that the murders were especially heinous, atrocious and cruel. However, because the trial court must issue another sentencing order (see Part I of this opinion), we order the trial court to specifically detail the facts that support its finding that the offenses were especially heinous, atrocious, or cruel, so that we may review its findings.

III.
Waldrop contends that the trial court's finding that the statutory mitigating factor that the capital offense was committed while the defendant was under the influence of extreme mental or emotional disturbance, see § 13A-5-51(2), Ala.Code 1975, did not exist was error. (Issue II(A)(iii) in Waldrop's brief to this Court at p. 61.) Additionally, he maintains that the trial court erred in determining that the statutory mitigating factor that the defendant lacked the capacity to appreciate the criminality of his conduct, see § 13A-5-51 *1149 (6), Ala.Code 1975, did not exist.[1] Waldrop argues that the trial court's determination was contrary to the evidence presented at trial and that it conflicted with a prior ruling made by the trial court. Specifically, he appears to argue that, because the State did not produce its own expert witness to testify concerning the effects of crack cocaine on a person, the trial court's determination in its sentencing order concerning his mental state and the ability to appreciate the criminality of his conduct at the time of the offenses was error.
During the sentencing phase of trial, Dr. Tackett testified that, after reviewing Waldrop's videotaped and written statement to law-enforcement officers, he determined that Waldrop was under the influence of crack cocaine at the time of the offenses.
Dr. Tackett stated that based on Waldrop's statement, he believed that, on May 5, Waldrop smoked crack cocaine a few hours before the incident occurred. Dr. Tackett further stated that, in his opinion, Waldrop was addicted to crack cocaine, and that during the incident on May 5, Waldrop was "on the depressive phase of coming down from being on the effects of crack cocaine." (R. 1017.) According Dr. Tackett, Waldrop was suffering extreme mental or emotional disturbance at the time the offenses occurred. Additionally, Dr. Tackett stated that he believed that Waldrop's ability to appreciate the criminality of his conduct and conform his conduct to the requirements of the law was substantially impaired.
During the sentencing phase of trial, Waldrop testified that he was addicted to crack cocaine at the time the offenses occurred and that his addiction and the use of crack cocaine caused him to kill his grandparents.
In Perkins v. State, 808 So.2d 1041 (Ala. Cr.App.1999), this Court stated:
"[M]erely because an accused proffers evidence of a mitigating circumstance does not require the judge or the jury to find the existence of that fact. Mikenas [v. State, 407 So.2d 892, 893 (Fla.1981) ]; Smith [v. State, 407 So.2d 894 (Fla. 1981)].' Harrell v. State, 470 So.2d 1303, 1308 (Ala.Cr.App.1984), aff'd, 470 So.2d 1309 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985). In Carroll v. State, 599 So.2d 1253 (Ala.Cr.App.1992), aff'd, 627 So.2d 874 (Ala.1993), cert. denied, 510 U.S. 1171, 114 S.Ct. 1207, 127 L.Ed.2d 554 (1994), this court stated:
"`We fully recognize that "[a] factfinder is not bound by expert testimony `even if all of the witnesses are presented by only one side.'" Ellis v. State, 570 So.2d 744, 752 (Ala.Cr.App. 1990). "In Alabama, opinion testimony of an expert witness is binding upon a jury only when such testimony concerns a subject which is exclusively within the knowledge of experts and the testimony is uncontroverted." Jefferson County v. Sulzby, 468 So.2d 112, 116 (Ala.1985). "An expert's opinion, however, is not conclusive on the trial court, even though uncontroverted. See Kroger Co. v. Millsap, 280 Ala. 531, 196 So.2d 380 (1967). Rather, a trial court must look to the entire evidence and its own observations in deciding factual issues." Williams v. City of Northport, 557 So.2d 1272, 1273 (Ala.Civ.App.1989), *1150 cert. denied, 498 U.S. 822, 111 S.Ct. 71, 112 L.Ed.2d 45 (1990). "Merely because an accused proffers evidence of a mitigating circumstance does not require the judge or the jury to find the existence of that fact" Harrell v. State, 470 So.2d 1303, 1308 (Ala.Cr. App.1984), affirmed, 470 So.2d 1309 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985).'"
808 So.2d at 1137. (Emphasis added.)

A.
Waldrop argues that the evidence presented by Dr. Tackett showed conclusively that he was suffering from an extreme mental or emotional disturbance at the time of the offense. Specifically, he claims that the trial court's failure to find that this mitigating circumstance existed indicates that the trial court ignored Dr. Tackett's testimony.
When considering the statutory mitigating factor that the capital offenses were committed while Waldrop was under the influence of an extreme mental or emotional disturbance, the trial court stated:
"(2) The capital offense was committed while the defendant was under the influence of extreme mental or emotional disturbance. The undersigned judge is convinced that this mitigating circumstance is not supported by evidence. Although the defendant contends that his cocaine addiction amounts to an extreme mental or emotional disturbance, on full reflection this court is convinced that a preponderance of the evidence shows that this circumstance does not exist. To the extent that cocaine addiction is to be considered at all as a mitigator, it is considered in connection with the second prong of statutory mitigating circumstance No. 6. The simple fact is that cocaine addiction is simply not the kind of extreme mental or emotional disturbance that the legislature had in mind when it enacted statutory mitigating circumstance No. 2."
(C. 166-67.)
While the record supports a conclusion that the trial court considered Dr. Tackett's testimony, in its sentencing order the trial court did not specifically state that it considered Dr. Tackett's testimony that he believed that Waldrop was suffering from an extreme mental or emotional disturbance at the time of the offenses. Therefore, we urge the court, when making its findings on remand, to indicate in its sentencing order that it considered Dr. Tackett's testimony. See Simmons v. State, 797 So.2d 1134, 1147 (Ala.2000) (stating that a succinct statement by the trial court that it considered an expert witness's testimony indicates that the trial court was aware of the testimony and that it followed the law requiring it to consider mitigating evidence presented). See also Perkins v. State, supra (discussing mitigation evidence presented by defense counsel through testimony of Dr. Goff).

B.
In the trial court's sentencing order, addressing whether the statutory mitigating circumstance that Waldrop's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired, the trial court stated:
"(6) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired. The defendant strongly contends that because he is a cocaine addict, he did not appreciate the criminality of his conduct and that his ability to conform his conduct to the requirements of law was substantially impaired. This contention is a central contention in *1151 the defendant's argument that his life should be spared. The evidence in this case clearly does not support a finding that the defendant lacked the capacity to appreciate the criminality of his conduct. On the contrary, the defendant knew exactly what he was doing. He acted with purpose and intent to achieve deliberately formed goals. He knew that his conduct was criminal as evidenced by his flight and attempts to conceal evidence pertaining to the crime.
"The more serious issue ... whether the capacity of the defendant to conform his conduct to the requirements of law was substantially impaired presents a more difficult question. Unquestionably, the defendant used cocaine and was addicted to the use of cocaine. However, the use of cocaine was voluntary, and it violated the criminal laws of the State of Alabama. The fact that this cocaine usage violated the criminal laws of Alabama is not an aggravating circumstance, but to recognize cocaine addiction as a mitigating circumstance would tend to undermine the laws and public policies of the State. This court finds that even though the defendant's voluntary use of cocaine may have impaired his ability to conform his conduct to the requirements of law, that circumstance is not entitled to receive a great deal of weight in the weighing of aggravating and mitigating circumstances. To do so will be to create a special class for capital murderers who use cocaine and to make that class less accountable than other capital murderers and less likely to receive the death penalty. The court finds that the State did not disprove by a preponderance of the evidence that the defendant's ability to conform his conduct to the requirements of law was impaired, but further finds that that circumstance is entitled to little or no weight."
(C. 167-69.) Thus, the trial court determined that Waldrop did have the capacity to appreciate the criminality of his conduct. However, the trial court determined that Waldrop's ability to conform his conduct to the requirements of the law was substantially impaired, but he gave this mitigating circumstance "little or no weight." (C. 169.)
In its sentencing order, the trial court specifically stated that evidence of flight and attempts to conceal evidence revealed that Waldrop had the capacity to appreciate the criminality of his conduct. While the trial court did not specifically address Dr. Tackett's conclusion that Waldrop's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired, the trial court's findings indicate that it carefully evaluated evidence that a cocaine addiction may present mitigating evidence. We urge the trial court to consider Dr. Tackett's testimony when addressing the statutory mitigating circumstance whether Waldrop had the capacity to appreciate the criminality of his conduct and to conform his conduct to the requirements of the law, and to provide specific details, including its reasons for its acceptance or rejection of Dr. Tackett's testimony when it issues its new sentencing order.

C.
Waldrop argues that, during the guilt phase of trial, the trial court initially ruled that the mitigating factors concerning Waldrop's mental state and his capacity to appreciate the criminality of his conduct and to conform his conduct to the requirements of the law existed.
Our review of the record indicates that the trial court indicated only that Dr. Tackett's testimony concerning Waldrop's mental state and his ability to conform his *1152 conduct to the requirements of the law and to appreciate the criminality of his conduct "might have very strong impact at sentencing." (R. 800.) During a hearing outside the presence of the jury, after Dr. Tackett had informed the trial court that he planned to testify concerning Waldrop's desire to acquire crack cocaine, the trial court informed Dr. Tackett to structure his testimony at the guilt phase of trial carefully, and warned him not to confuse physiological motivation with the intentional taking of a human life. (R. 801.) The trial court indicated that Dr. Tackett's testimony concerning Waldrop's alleged uncontrollable desire for crack cocaine would "fit in" when addressing the statutory mitigating circumstances at sentencing. (R. 801.) Because the trial court did not determine, during the guilt or sentencing phase, that Dr. Tackett's testimony presented conclusive evidence of the statutory mitigating factors, Waldrop's contention is without merit.

IV.
In summary, we are remanding this cause to the trial court: 1) to reweigh the mitigating and aggravating circumstances and to apply the appropriate weight to each circumstance, especially the statutory mitigating circumstance that Waldrop lacked a significant history of criminal activity; 2) to clarify its findings by specifically detailing the facts in support of its findings that the offenses were especially heinous, atrocious or cruel; 3) to clarify its consideration of Dr. Tackett's testimony with regard to the applicable mitigating circumstance determinations; and 4) to issue a new sentencing order listing specific written findings pursuant to § 13A-5-47(d), Ala.Code 1975.
Because the trial court overrode the jury's recommended sentence of life imprisonment without parole, it will not be necessary for the trial court to conduct another sentencing-phase hearing before the jury. See Carroll v. State, 852 So.2d 801 (Ala.Cr.App.1999). The trial judge has the authority to resentence Waldrop in the event that he determines that death is not a proper sentence. See Parker v. State, 587 So.2d 1072, 1100 (Ala.Cr.App. 1991), aff'd, 610 So.2d 1181 (Ala.1992), cert. denied, 509 U.S. 929, 113 S.Ct. 3053, 125 L.Ed.2d 737 (1993). The rewritten sentencing order of the trial court shall be filed in this Court within 35 days from the date of this opinion.
REMANDED WITH DIRECTIONS.
LONG, P.J., and McMILLAN and COBB, JJ., concur; BASCHAB, J., concurs in the result.

On Return to Remand
FRY, Judge.
On June 30, 2000, we remanded this cause to the trial court for that court to reweigh the mitigating and aggravating circumstances and then to issue a new sentencing order. Waldrop v. State, 859 So.2d 1138 (Ala.Crim.App.2000). The trial court has complied with our order, issued a new sentencing order, and sentenced Waldrop to death. When we issued our June 30 opinion, we deferred addressing the other issues Waldrop raised on appeal, pending the trial court's compliance with our directions on remand. We will now address those issues.[1]
*1153 The appellant, Bobby Wayne Waldrop, was convicted of three counts of capital murder: two counts of murder committed during a robbery in the first degree, see § 13A-5-40(a)(2), Ala.Code 1975; and one count of murder where two or more persons are murdered, see § 13A-5-40(a)(10), Ala.Code 1975. The jury, by a vote of 10-2, recommended that Waldrop be sentenced to life imprisonment without the possibility of parole. The trial court imposed the death sentence.
Waldrop was convicted of murdering his grandparents, Irene and Sherrell Prestridge. The facts surrounding the murders are detailed in our June 30, 2000, opinion.
Waldrop raises several issues, many of which were not presented to the trial court. Waldrop, however, was sentenced to death; therefore, his failure to raise these claims at trial does not prevent our review of them. It does weigh against Waldrop as to any claim of prejudice he now makes on appeal. See Burgess v. State, 723 So.2d 742 (Ala.Crim.App.1997); Kuenzel v. State, 577 So.2d 474 (Ala.Crim. App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991). Additionally, "`the plain error exception to the contemporaneous-objection rule is to be "used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result." `" Burton v. State, 651 So.2d 641, 645 (Ala.Crim.App.1993), aff'd, 651 So.2d 659 (Ala.1994), cert. denied, 514 U.S. 1115, 115 S.Ct. 1973, 131 L.Ed.2d 862 (1995), quoting United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985) (quoting, in turn, United States v. Frady, 456 U.S. 152, 163, 102 S.Ct. 1584, 1592, 71 L.Ed.2d 816 (1982)).
"In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."
Rule 45A, Ala.R.App.P.
Accordingly, we will now address the issues raised by Waldrop.

*1154 Guilt-phase Issues

I.
Waldrop contends that the trial court abused its discretion by, he says, failing to conduct an investigation and to consider certain factors in denying his application for youthful-offender status. He raises this issue for the first time on appeal. Thus, we will review his contention for plain error. Rule 45A, Ala.R.App.P.
In Reese v. State, 677 So.2d 1239 (Ala. Crim.App.1995), this Court stated:
"In determining whether to treat a defendant as a youthful offender, the trial court has nearly absolute discretion. Morgan v. State, 363 So.2d 1013 (Ala.Crim.App.1978); see also, Ex parte Farrell, 591 So.2d 444, 449-50, n. 3 (Ala. 1991). There is no set method for considering a motion requesting such treatment. Edwards v. State, 294 Ala. 358, 317 So.2d 512 (1975). However, the Youthful Offender Act, § 15-19-1, Ala. Code, 1975, requires that the court conduct a factual investigation into the defendant's background. Ware v. State, 432 So.2d 555 (Ala.Crim.App.1983). Generally, the trial court considers the nature of the crime charged, any prior convictions, the defendant's age, and any other matters deemed relevant by the court. Clemmons v. State, 294 Ala. 746, 321 So.2d 238 (1975). Moreover, the trial court need not articulate on the record its reasons for denying the defendant youthful offender status. Garrett v. State, 440 So.2d 1151, 1152-53 (Ala. Crim.App.1983), cert. denied (Ala.1983). Accord, Goolsby v. State, 492 So.2d 635 (Ala.Crim.App.1986).
"The appellant relies on Watkins v. State, 357 So.2d 156 (Ala.Crim.App. 1977), cert. denied, 357 So.2d 161 (Ala. 1978), for his contention that the trial court may not deny youthful offender status after consideration of only one factor, i.e., the nature of the crime charged. However, there is no support in this record for the contention that the trial court considered only that one factor. The trial court, in fact, expressly stated that the appellant's motion for youthful offender treatment was denied `based on the investigation and other matters.' (R. Supp.# 2, 3-4.)
"This court held in Miller v. State, 650 So.2d 940 (Ala.Crim.App.1993), rev'd on other grounds, 650 So.2d 947 (Ala.1994), that
"`[w]here the record does not support the contention that youthful offender status was denied solely on the basis of the crime charged, this court will not reverse the trial court's decision to deny youthful offender status. Burks v. State, 600 So.2d 374, opinion after remand, 600 So.2d 387 (Ala.Crim.App. 1991).'"
677 So.2d at 1240. See also Wigfall v. State, 710 So.2d 931, 934 (Ala.Crim.App. 1997) (where trial court heard, during youthful-offender hearing, argument on the seriousness of the charge, evidence indicating the nature of the circumstances upon which the charge was based, evidence of the defendant's age, and other relevant factors concerning the defendant and his home life, the trial court did not abuse its discretion in denying youthful offender status); Robinson v. State, 728 So.2d 650, 653 (Ala.Crim.App.1997) (hearing on the motion for youthful-offender status revealed that the trial court based its decision on numerous factors in addition to the nature of the crime charged).
On January 7, 1998, a hearing was conducted addressing Waldrop's application for youthful-offender status. The record indicates that, during the hearing, the trial court read the allegations contained in the indictment and reviewed the application. The application revealed Waldrop's *1155 family history and indicated that Waldrop had previously been adjudicated guilty as a youthful offender of possession of marijuana and possession of drug paraphernalia, and that he had been convicted of second-degree theft of property. Additionally, the application addressed Waldrop's educational background, indicating that he had completed ninth grade and that he was able to read and write. The application further revealed that, although Waldrop had experimented with marijuana and cocaine, he had never suffered from a serious mental illness and had never been under the care of a psychiatrist. At the hearing, Waldrop indicated that the information contained in the youthful-offender application was substantially correct. Testimony during the hearing further established that Waldrop was 19 years old when the offenses occurred. In an order dated January 13, 1999, the trial court stated, "Based on the matters presented to the Court, the defendant's application for treatment as a youthful offender is hereby denied." (C. 31.)
Given that the record does not support Waldrop's contention that youthful-offender status was denied solely on the basis of the offenses charged, this Court will not reverse the trial court's decision to deny youthful-offender status. See Wigfall, 710 So.2d at 934. The trial court did not abuse its discretion in denying Waldrop's application for youthful offender status.

II.
Waldrop maintains that the trial court erred in denying his motion to suppress statements he made to the police. (Issue V in Waldrop's brief to this Court at p. 75.) Specifically, he claims that he was unable to understand his Miranda[2] rights and that he did not voluntarily waive those rights because, he says, at the time of the interrogation, he was under the influence of crack cocaine, he had been deprived of food and sleep, and he was emotional.
In Maples v. State, 758 So.2d 1 (Ala. Crim.App.1999), this Court stated:
"`"`In reviewing the correctness of the trial court's ruling on a motion to suppress, this Court makes all the reasonable inferences and credibility choices supportive of the decision of the trial court.'" Kennedy v. State, 640 So.2d 22, 26 (Ala.Cr.App.1993), quoting Bradley v. State, 494 So.2d 750, 761 (Ala.Cr.App.1985), aff'd, 494 So.2d 772 (Ala.1986), cert. denied, 480 U.S. 923, 107 S.Ct. 1385, 94 L.Ed.2d 699 (1987). A trial court's ruling on a motion to suppress will not be disturbed unless it is "palpably contrary to the great weight of the evidence." Parker v. State, 587 So.2d 1072, 1088 (Ala.Cr.App.1991).'
"Rutledge v. State, 680 So.2d 997, 1002 (Ala.Cr.App.1996)."
758 So.2d at 41.
It has long been the law that a confession is prima facie involuntary and inadmissible, and that before a confession may be admitted into evidence, the burden is upon the State to establish voluntariness and a Miranda predicate. Jackson v. State, 562 So.2d 1373, 1380 (Ala.Crim.App. 1990). A two-pronged test is used to determine whether an accused's statement is admissible. First, the trial court must determine whether the accused was informed of his Miranda rights. Second, the trial court must determine whether the accused voluntarily and knowingly waived his Miranda rights before making his statement. Holder v. State, 584 So.2d 872, 878 (Ala. Crim.App.1991); Carpenter v. State, 581 So.2d 1277, 1278 (Ala.Crim.App.1991).
*1156 This Court addressed the voluntariness of a waiver of Miranda rights in Click v. State, 695 So.2d 209 (Ala.Crim.App.1996):
"Whether a waiver is voluntary, knowing, and intelligent depends on the particular facts and underlying circumstances of each case, including the background, experience, and conduct of the accusedi.e., the totality of the circumstances. Magwood v. State, 494 So.2d 124, 135 (Ala.Cr.App.1985), aff'd, 494 So.2d 154 (Ala.), cert. denied, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986); Chandler v. State, 426 So.2d 477 (Ala.Cr.App.1982) (citing Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981)); Myers v. State, 401 So.2d 288 (Ala.Cr.App.1981.) The trial court need only be convinced from a preponderance of the evidence that a confession or inculpatory statement was voluntarily made. Magwood v. State, supra; Harris v. State, 420 So.2d 812 (Ala.Cr.App.1982). The finding of the trial court as to voluntariness will not be disturbed unless it appears contrary to the great weight of the evidence. Dill v. State, 600 So.2d 343, 368 (Ala.Cr.App. 1991), aff'd, 600 So.2d 372 (Ala.1992), cert. denied, 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993); Magwood v. State, supra."
695 So.2d at 218.
In Jackson v. State, 674 So.2d 1318 (Ala. Crim.App.1993), aff'd as to conviction, rev'd and rem'd as to sentence, 674 So.2d 1365 (Ala.1994), this Court stated:
"`"`[U]nless intoxication, in and of itself, so impairs the defendant's mind that he is "unconscious of the meaning of his words," the fact that the defendant was intoxicated at the time he confessed is simply one factor to be considered when reviewing the totality of the circumstances surrounding the confession.' Carr v. State, 545 So.2d 820, 824 (Ala.Cr. App.1989). `The intoxicated condition of an accused when he makes a confession, unless it goes to the extent of mania, does not affect the admissibility and evidence of the confession, but may effect its weight and credibility.' Callahan v. State, 557 So.2d 1292, 1300 (Ala.Cr.App.), affirmed, 557 So.2d 1311 (Ala. 1989)."
"`White v. State, 587 So.2d 1218 (Ala. Cr.App.1990).'
"State v. Austin, 596 So.2d 598, 601 (Ala.Cr.App.1991)."
Jackson v. State, 674 So.2d at 1326. See also Gaddy v. State, 698 So.2d 1100, 1117 (Ala.Crim.App.1995), aff'd, 698 So.2d 1150 (Ala.), cert. denied, 522 U.S. 1032, 118 S.Ct. 634, 139 L.Ed.2d 613 (1997). "`Mere emotionalism and confusion do not dictate a finding of mental incompetency or insanity' so as to render a statement inadmissible." Callahan v. State, 557 So.2d 1292, 1300 (Ala.Crim.App.1989), quoting Sullivan v. Alabama, 666 F.2d 478, 483 (11th Cir.1982).
A trial court's determination that a defendant voluntarily waived his Miranda rights will not be overturned absent an abuse of discretion. Thompson v. State, 503 So.2d 871, 877-78 (Ala.Crim. App.1986); Duncan v. State, 278 Ala. 145, 176 So.2d 840 (Ala.1965). "Where the trial judge finds conflicting evidence that the confession was voluntarily made, its finding will not be disturbed on appeal unless found to be contrary to the great weight of the evidence." Thompson, 503 So.2d at 878. "`When there is conflicting evidence of the circumstances surrounding an incriminating statement or a confession, it is the duty of the trial judge to determine its admissibility, and if the trial judge decides it is admissible his decision will not be disturbed on appeal "unless found to be *1157 manifestly contrary to the evidence."'" A.W.M. v. State, 627 So.2d 1148, 1150 (Ala. Crim.App.1993), quoting Ex parte Matthews, 601 So.2d 52, 53 (Ala.), cert. denied, 505 U.S. 1206, 112 S.Ct. 2996, 120 L.Ed.2d 872 (1992). See, e.g., Burks v. State, 600 So.2d 374, 380 (Ala.Crim.App.1991); Leonard v. State, 551 So.2d 1143, 1148 (Ala. Crim.App.1989).
During the suppression hearing, Todd Wheeles, an agent for the Alabama Bureau of Investigations, testified that at 11:55 a.m. on April 7, 1998, in a room at the Coweta County sheriff's office, he read Waldrop his Miranda rights and the waiver-of-rights form. Investigator Wheeles stated that he did not speak to Waldrop before he read him his Miranda rights. Additionally, the record indicates that Waldrop was not handcuffed and that he had not been charged with the murder of his grandparents. Investigator Wheeles stated that Waldrop signed the waiver-of-rights form, which listed his Miranda rights. (C. 181.) The form signed by Waldrop stated:
"I have been advised of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me."
(C. 181.) Investigator Wheeles stated that James Bailey, an investigator for the Randolph County Sheriff's Department, was also present and took notes during the interview. According to Investigator Wheeles, neither he nor Investigator Bailey threatened, coerced, or promised Waldrop anything in return for his making a statement.
Investigator Wheeles testified that, after Waldrop waived his rights, he asked Waldrop if he understood why he was being questioned, and Waldrop stated that he knew that the questioning was in reference to the deaths of Irene and Sherrell. (Supp. R. 18.) Investigator Wheeles stated that, in his opinion, Waldrop did not appear to be under the influence of crack cocaine. According to Investigator Wheeles, Waldrop drank a soft drink and smoked cigarettes during the interview.
Additionally, Investigator Wheeles testified that, after initially questioning Waldrop, Investigator Bailey reviewed his notes and wrote a summary of Waldrop's statement. Investigator Wheeles stated that Investigator Bailey read the statement to Waldrop, and that, at 1:28 p.m., Waldrop signed the statement. In that statement, Waldrop indicated that, on the evening of April 5, 1998, he and Clara went to a friend's house and smoked crack cocaine for several hours. Waldrop stated that, later that evening, he and Clara returned to his grandparents' house, and that he and his grandfather argued about money. Waldrop gave a detailed statement relating the killing of his grandparents. Waldrop indicated that, during the early morning hours of April 6, he and Clara returned to his friend's house and that he purchased approximately $250 worth of crack cocaine, and that he and the friend smoked the crack cocaine. Waldrop stated that, after he finished smoking the cocaine, he purchased another $250 worth of crack cocaine and that he and a friend smoked it. The statement reveals that Waldrop stated that, later, on the evening of April 6, he smoked an additional amount of crack cocaine worth approximately $50.
The record indicates that, on April 7 at 1:05 p.m. in a room at the Coweta County Sheriff's Department, Investigator Wheeles and Investigator Bailey interrogated Waldrop and that Waldrop gave a second videotaped statement. In that videotape, *1158 Waldrop acknowledged that the officers had read to him his Miranda rights and that he understood that he had waived his rights. Additionally, Waldrop acknowledged that he understood he was being questioned about the deaths of his grandparents. Waldrop stated that, after killing his grandparents during the late evening of April 5 or the early morning hours of April 6, he and Clara went to a friend's house and smoked approximately $250 worth of crack cocaine. Additionally, Waldrop indicated that, after most of the crack cocaine was gone, he purchased approximately $200 worth of crack cocaine and smoked it with friends. Waldrop stated that, on the afternoon of April 6, he and Clara drove around and smoked approximately $40 worth of crack cocaine. Waldrop indicated that the car ran out of gas and that he and Clara remained in the car overnight. Waldrop stated that, on the early morning of April 7, Clara obtained gasoline from a nearby gas station and filled up their car. Waldrop further stated that they went to Clara's mother's house, and that Clara's mother told them about the incident, and told them that they needed to give a statement to the police. Waldrop's videotaped interview ended at 1:25 p.m.
The trial court made the following determination:
"I have heard the evidence. There is no question that the defendant was properly Mirandized. There is no question that the statement was voluntarily made. I have looked at the tape. There's no visible evidence that he was under the influence of drugs so as to be impaired to the extent that he didn't know what he was doing or that he was subject to anyor being coerced or influenced by the police to do what he was doing. In fact, his statement was the epitome of voluntariness. He freely told everything that he did and said. And, of course, I'm not expert enough to know whether he might have had some drugs in his system or not. I think legally it didn't make too much difference even if he had some lingering effects of voluntarily ingested drugs in his system. I don't think that would effect the admissibility of the evidence. And, how much effect it has on the weight would be up to the trier of fact, not the Court. So, the motion to suppress is denied." (R. 43-44.) At trial, the videotaped statement was played to the jury.
As did the trial court, we have reviewed the statement contained in the record and the videotaped statement. Although the record indicates that Waldrop was emotional and that he cried during the videotaped statement, a review of the videotape reveals that Waldrop answered the law-enforcement officers' questions in a coherent manner and that he appeared to understand their questions. We conclude that there is no indication that Waldrop was so intoxicated that he could not comprehend his circumstances or that his statements were rendered involuntary.
Additionally, we reject Waldrop's argument that his statements were not voluntary because, he says, when he made them he had been deprived of food or sleep for a prolonged time. See, e.g., Pardue v. State, 695 So.2d 199 (Ala.Crim. App.1996). Indeed, there was no testimony from any officers indicating that Waldrop had not received any food or that he had been prevented from sleeping, or that he was exhausted to the point of being unable to give a voluntary statement. The record simply does not establish that Waldrop was deprived of food or sleep before he made the statement. Moreover, whether a defendant was physically exhausted when he gave his statement is merely one factor to be considered by the jury in *1159 determining the credibility and weight to afford the statement. Burgess v. State, supra.
Waldrop also appears to argue that there was no showing that he was able to read the waiver-of-rights form and the transcribed statement he signed. Although testimony during the suppression hearing did not reveal the level of Waldrop's education, Investigator Bailey testified at trial that Waldrop told him he had completed ninth grade, and that he could read, and write, and that he understood the English language. In Ex parte Price, 725 So.2d 1063 (Ala.1998), the Supreme Court of Alabama stated:
"[W]e will apply the long-standing rule that, in considering whether the trial court properly overruled a defendant's motion to suppress an extrajudicial confession or other inculpatory statement, a reviewing court may consider both the evidence presented at the pretrial suppression hearing and the evidence presented at trial. See, e.g., Henry v. State, 468 So.2d 896, 899 (Ala.Crim.App. 1984)."
725 So.2d at 1067. (Some citations omitted.) Because Investigator Bailey's testimony revealed that Waldrop was capable of reading the waiver-of-rights form and the transcribed statement, the trial court did not err in admitting the statement.
There was ample evidence from which the trial court could conclude that Waldrop's statements were knowingly and voluntarily made. Thus, the trial court's determination was not palpably contrary to the great weight of the evidence.

III.
Waldrop maintains that, under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), he was denied due process because, he says, the State failed to comply with the trial court's discovery order concerning alleged exculpatory evidence. (Issue IV in Waldrop's brief to this court at p. 68.) Specifically, he refers to notes written by Investigator Wheeles during his interview with him on April 7, 1998. Waldrop argues that because Investigator Wheeles destroyed his notes containing allegedly exculpatory material, the trial court should not have admitted into evidence the signed statement summarizing the information contained in the notes taken during Waldrop's interview.
The evidence at issue here was notes taken by Investigator Wheeles during an interview of Waldrop on April 7, 1998. During a suppression hearing, Investigator Wheeles testified that, in accordance with a standard precautionary procedure of the Alabama Bureau of Investigation, he destroyed those notes. Additionally, Investigator Wheeles stated that Investigator James Bailey compiled a statement summarizing the information contained in his and Investigator Bailey's notes taken during the interview. Investigator Wheeles indicated that the information contained in that statement did not vary from the destroyed notes. However, at trial, Investigator Wheeles testified that Waldrop had initially told him that he was in Georgia when his grandparents were killed. Waldrop's statement concerning his alleged absence from the state during the murders was not contained in the statement summarizing Waldrop's interview. Defense counsel objected and moved for a mistrial on the ground that the State had violated the trial court's discovery order and had failed to produce the statement concerning Waldrop's alleged absence from the state during the murders. The trial court overruled the objection and denied the motion for a mistrial. The trial court further determined that, because defense counsel was able to confer with Waldrop concerning *1160 any statements he had made, defense counsel had access to the information.
In Freeman v. State, 722 So.2d 806 (Ala. Crim.App.1998), this Court addressed the discovery of a defendant's statements to the police, wherein we stated:
"To prove a Brady violation, a defendant must show that `"(1) the prosecution suppressed evidence; (2) the evidence was favorable to the defendant; (3) the evidence was material to the issues at trial."` Johnson v. State, 612 So.2d 1288, 1293 (Ala.Cr.App.1992), quoting Stano v. Dugger, 901 F.2d 898, 899 (11th Cir.1990), cert. denied, Stano v. Singletary, 516 U.S. 1122, 116 S.Ct. 932, 133 L.Ed.2d 859 (1996). See Smith v. State, 675 So.2d 100 (Ala.Cr.App. 1995). `"The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A `reasonable probability' is a probability sufficient to undermine confidence in the outcome." `Johnson, 612 So.2d at 1293, quoting United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985).
". . . .
"... As for the appellant's statement to the police, the appellant's counsel could have discovered from the appellant himself the fact that the appellant had given a statement. Thus, the appellant could have obtained all of the evidence in question by exercising due diligence. `There is no Brady violation where the information in question could have been obtained by the defense through its own efforts.' Johnson, 612 So.2d at 1294; see also Jackson v. State, 674 So.2d 1318 (Ala.Cr.App.1993), aff'd in part and rev'd in part on other grounds, 674 So.2d 1365 (Ala.1994). `"Evidence is not `suppressed' if the defendant either knew... or should have known ... of the essential facts permitting him to take advantage of any exculpatory evidence." United States v. LeRoy, 687 F.2d 610, 618 (2d Cir.1982)[, cert. denied, 459 U.S. 1174, 103 S.Ct. 823, 74 L.Ed.2d 1019 (1983)].' Carr v. State, 505 So.2d 1294, 1297 (Ala.Cr.App.1987) (noting, `The statement the appellant contends was suppressed in this case was his own, and no reason was set forth to explain why he should not have been aware of it.') Where there is no suppression of evidence, there is no Brady violation. Carr, 505 So.2d at 1297."
722 So.2d at 810-11.
Given that defense counsel was able to confer with Waldrop regarding the statement, Waldrop has failed to establish that he was injured by the destruction of Investigator Wheeles's notes. Because a Brady violation did not occur, the trial court did not abuse its discretion in admitting into evidence the statement summarizing Waldrop's interview.[3]

IV.
Waldrop maintains that the admission into evidence of his statements, fingerprints, DNA exemplars, and personal letters was error because, he says, they were "fruits of the poisonous tree." (Issue VI in Waldrop's brief to this Court at p. 79.) Specifically, he argues that his arrest was illegal because, he claims, the officers did not have probable cause to arrest him without a warrant.
*1161 Waldrop has raised this issue for the first time on appeal. Thus, we will review this contention only to determine whether plain error occurred. Rule 45A, Ala. R.App.P.
A review of the record reveals that Waldrop did not request a hearing to determine whether there was probable cause to arrest him and that the trial court did not conduct such a hearing. Additionally, the record presents conflicting evidence as to when Waldrop was arrested.[4] Furthermore, the record does not include any testimony as to why the police in Coweta County took Waldrop into custody. In Arthur v. State, 711 So.2d 1031 (Ala. Crim.App.1996), this Court stated:
"`"`This court cannot predicate error on matters not shown by the record, nor can we presume error from a silent record.' Smelcher v. State, 520 So.2d 229 (Ala.Cr.App.1987); Abbott v. State, 494 So.2d 789 (Ala.Cr.App.1986). `Where the record is silent on appeal, it will be presumed that what ought to have been done was not only done, but rightly done.' Jolly v. State, 405 So.2d 76 (Ala. Cr.App.1981); Watson v. State, 398 So.2d 320 (Ala.Cr.App.1980), writ denied, 398 So.2d 332 (Ala.), cert. denied, 452 U.S. 941, 101 S.Ct. 3085, 69 L.Ed.2d 955 (1981)."` Gaddy v. State, 698 So.2d [1100,] 1130 [(Ala.Cr.App.1995)], quoting Owens v. State, 597 So.2d 734, 736 (Ala. Cr.App.1992)."
711 So.2d at 1087. Waldrop's argument that he was illegally arrested is based on speculation and conjecture. In this case, from the record before us, we are unable to predicate error.
Furthermore, any error in the lack of testimony as to probable cause to take Waldrop into custody or to arrest Waldrop was invited by the defense. The record indicates that, during the direct examination of Donnie Payne, an investigator at the Coweta County Sheriff's Office, the prosecution attempted to elicit testimony concerning what led him to take Waldrop into custody. (R. 567.) The defense objected to the admission of the testimony, and the trial court sustained the objection.
In Harris v. State, 632 So.2d 503 (Ala. Crim.App.1992), this Court stated:
"`An accused cannot by his own voluntary conduct invite error and then seek to profit thereby.' Spears v. State, 428 So.2d 174, 179 (Ala.Crim.App.1982). `The invited error rule has been applied equally in both capital cases and non-capital cases.' Rogers v. State, 630 So.2d 78 (Ala.Cr.App.1991), reversed on other grounds, 630 So.2d 88 (Ala.1992)."
632 So.2d at 540. Because the defense objected to testimony concerning Officer Payne's reasons for taking Waldrop into custody at the mobile home, any error was invited by the defense.

V.
Waldrop contends that the State failed to establish a prima facie case of murder committed during a robbery in the first degree (two counts), and murder wherein two or more persons are murdered pursuant to one scheme or course of conduct (one count). (Issue III in Waldrop's brief *1162 to this Court at p. 64.) Specifically, he argues that the State did not establish that the murder occurred during a robbery because, he says, the alleged robbery was "as an afterthought" to the murders. (Waldrop's brief to this Court at p. 65.) Additionally, he argues that the State did not establish that a "common plan or scheme" existed.
Section 13A-5-40(a)(2), Ala.Code 1975, defines "[m]urder by the defendant during a robbery in the first degree or an attempt thereof committed by the appellant" as a capital offense.
"`To sustain a conviction under § 13A-5-40(a)(2) for capital murder-robbery, the State must prove beyond a reasonable doubt: (1) a "robbery in the first degree or an attempt thereof," as defined by § 13A-8-41, (2) a "murder" as defined by § 13A-6-2(a)(1), and (3) that the murder was committed "during" the robbery or attempted robbery, i.e. that the murder was committed "in the course of or in connection with the commission of, or in immediate flight from the commission of the robbery or attempted robbery in the first degree.'"
Rowell v. State, 570 So.2d 848, 850 (Ala. Crim.App.1990), quoting Connolly v. State, 500 So.2d 57, 62 (Ala. Crim.App. 1985).
Section 13A-5-40(a)(10), Ala.Code 1975, defines "[m]urder wherein two or more persons are murdered by the defendant by one act or pursuant to one scheme or course of conduct" as a capital offense.
Section 13A-2-2(1), Ala.Code 1975, states, "A person acts intentionally with respect to a result or to conduct described by a statute defining an offense, when his purpose is to cause that result or to engage in that conduct." Intent may be inferred from the use of a deadly weapon. See Long v. State, 668 So.2d 56, 60 (Ala. Crim.App.1995); Buskey v. State, 650 So.2d 605, 609 (Ala.Crim.App.1994). Additionally, "[t]he question of a defendant's intent at the time of the commission of the crime is usually an issue for the jury to resolve." Rowell v. State, 570 So.2d at 850, citing Crowe v. State, 435 So.2d 1371, 1379 (Ala.Crim.App.1983). Intent may be "`inferred from the character of the assault, the use of a deadly weapon and other attendant circumstances.'" Jones v. State, 591 So.2d 569, 574 (Ala.Crim.App. 1991), quoting Johnson v. State, 390 So.2d 1160, 1167 (Ala.Crim.App.), cert. denied, 390 So.2d 1168 (Ala.1980). A knife is a deadly weapon. See Jones v. State, 591 So.2d at 574 (butcher knife). Cf. Wilson v. State, 777 So.2d 856 (Ala.Crim.App.1999).
In deciding whether the State presented sufficient evidence to support a conviction, this Court must view the evidence in the light most favorable to the prosecution. Bayhi v. State, 629 So.2d 782, 788 (Ala.Crim.App.1993). We must accept as true evidence introduced by the prosecution, make all legitimate inferences from that evidence, and consider that evidence in the light most favorable to the prosecution. McKinney v. State, 654 So.2d 95, 99 (Ala.Crim.App.1995); Johnson v. State, 623 So.2d 444, 447 (Ala.Crim.App. 1993). It is not the province of this Court to reweigh the evidence. Council v. State, 682 So.2d 495, 497 (Ala.Crim.App.), cert. denied, 682 So.2d 500 (Ala.1996); Black v. State, 680 So.2d 942, 944 (Ala.Crim.App. 1995). "Conflicting evidence presents a jury issue." Curry v. State, 601 So.2d 157, 159 (Ala.Crim.App.1992), citing Smith v. State, 583 So.2d 990 (Ala.Crim.App.), cert. denied, 583 So.2d 993 (Ala.1991). This Court will not substitute its judgment for that of the jury on the question whether the evidence was sufficient to sustain a conviction. Brandon v. State, 542 So.2d 1316, 1319 (Ala.Crim.App.1989). "[C]ircumstantial evidence is entitled to the *1163 same weight as direct evidence, provided it points to the guilt of the accused." Stephens v. State, 580 So.2d 11, 24 (Ala.Crim. App.1990), aff'd, 580 So.2d 26 (Ala.1991), cert. denied, 502 U.S. 859, 112 S.Ct. 176, 116 L.Ed.2d 138 (1991).
The State's evidence tended to establish the following. Nancy Rostefer testified that the victims, Sherrell and Irene Prestridge, were her parents. Rostefer testified that the last time she spoke to her father was around 8:30 p.m. on April 5, 1998 (the day of the murders). Rostefer testified that, on April 6, 1998, around 7:00 a.m., she, her husband, and her two children went to her parents' house. Rostefer stated that she went inside the house and into her parents' bedroom. According to Rostefer, she turned around and noticed that Irene's throat was bleeding; she screamed. Rostefer stated that her husband and children came inside and found Sherrell.
Lee Anderson, a forensic scientist, testified that he arrived at the scene at 11:30 a.m. on April 6. Anderson stated that the living room of the house had been converted into a bedroom with two hospital beds. According to Anderson, Irene was lying on her back on a bed and Sherrell was lying face-down, partially under the second bed. Anderson stated that both victims suffered multiple stab wounds.
Leonard Coats, the owner of a gun and pawning business, testified that around 1:00 p.m. on April 5, 1998, Waldrop and Clara pawned a riding lawnmower. Rostefer testified that the lawnmower belonged to Sherrell.
Anisha Patel, the manager of a motel in Anniston, Alabama, testified that on April 5, 1998, at some time between 10:30 a.m. and 2:00 p.m., Clara and another person checked into a motel room. Patel further stated that the registration card was signed "Clara Waldrop." (C. 159, R. 372-73.)
Kathy Nunn, Waldrop's friend, testified that around 2:30 a.m. on April 6, 1998, she visited Pete Wyatt at his house. Nunn stated that Waldrop and Clara arrived at the house and asked her where they could purchase some drugs. According to Nunn, she, Clara, and Waldrop went to a drug dealer's house; at the house, Waldrop purchased approximately $125 worth of crack cocaine. Nunn testified that they returned to Wyatt's house and that they smoked the crack cocaine. Nunn stated that a man arrived at Wyatt's house, and that Waldrop and the man left and purchased more crack cocaine. Nunn indicated that, at some point during her visit at Wyatt's, she saw some $100 bills in Waldrop's wallet. Nunn further stated that, approximately one hour later, Waldrop returned to the house with more crack cocaine, and that they smoked it. According to Nunn, she asked Waldrop to loan her a few dollars. Nunn testified that Waldrop looked in his wallet and handed her three dollars, and that, because he gave her the last of the money remaining in his wallet, he asked Clara to give him a different wallet. Nunn stated that she saw Clara remove a man's wallet from her purse and hand it to Waldrop. Nunn stated that Waldrop had a cut on his finger. Additionally, Nunn stated that she estimated that Waldrop spent approximately $500 on crack cocaine. Nunn testified that when Waldrop and Clara left Wyatt's residence, they told her that they were going to Disney World. Nunn further testified that, later that day, Clara and Waldrop returned to Wyatt's residence and asked where they could purchase $50 worth of crack cocaine.
Investigator Wheeles stated that Waldrop was taken into custody in Coweta County, Georgia, on April 7, 1998. Investigator Wheeles testified that, after he *1164 read Waldrop his Miranda rights, Waldrop waived his rights and gave a statement to him and Investigator Bailey at the Coweta County Police Department. Investigator Wheeles stated that he and Investigator Bailey took notes during the interview, and that Investigator Bailey then wrote a summary of Waldrop's statement. The record indicates that Investigator Bailey read the statement to Waldrop, and that, on April 7, 1998, at 1:28 p.m., Waldrop signed it. The statement, signed by Waldrop, stated the following:
"Sunday evening Clara, me, [Irene,] and [Sherrell], were getting ready for church at Standing Rock and they went to Idama [sic]. We were late and I thought it would start at 6:30 Georgia [time] and we went to Pete, Fat Man's and did coke and meth. I bought from Pete. We all smoked together for several hours. Fat Man and I left going to get some coke. I stopped at the Chevron and called Grandma and told her I was going to be out. We (Fat Man and I) went back to Pete's and smoked some more. Clara and I left Pete's and went back to Grandma's and they were watching T.V. [Sherrell] and I got to fussing about me borrowing some money and I was so high and I know he has a monthly income. I went into the kitchen and got the knife and come back. [Sherrell] pushed me and he saw the knife and that's when I swung the knife at his throat and he started to bleed from the throat real bad. [Sherrell] was at the foot of the bed and I started to stab him and I had the knife in my left hand and cut myself in the hand. I got on top of him in the floor and started to choke him, and he wouldn't stop breathing, so I cut a little more on both sides of his neck. It was to fate [sic]. I stuck the knife into his back and I figured it would hit his lungs and he'd stop breathing. I just wanted to finish what I started. It looked like he was suffering. [Irene] was screaming. Clara got a knife and I told her to just stab her in the chest. I went in and Clara had maybe stabbed [Irene] twice and she was still screaming. I took the knife and cut her throat. After I finished washing off the blood, I got the two knives and left after getting [Sherrell]'s wallet. We went back to Bowdon, Georgia. I bought about $250 worth of crack and used it all up. I had about $250 more and Clara and I started to take off. At that time we had $50 and we talked yesterday and didn't have any money and we came back to Carrolton and Bowdon. The stores were closed and we ran out of gas and slept there and Clara walked up the road to get some gas. And come onto Ponesville [sic] Groceries, Clara called collect to Diane's and she told us what had happened. Clara and I went on up to Diane's and called my Mom's (Shirley Ireland's) and I left my blue Honda Accord at Diane's house and Clara and I rode with her to Newnan, Georgia and I called my dad and after I had finished talking to him, the Sheriff's Department pulled up and I came up here.
"When Clara and I left the house, I put the knife that I had and Clara had and put it into a plastic bag with a bath towel and the gloves Clara had on his [sic] hand, and the gloves I had on. One pair was latex and the other was just cloth. I got the gloves after I had killed Grandpa from the trunk of my car. It's the one I had from Goldkist. I through [sic] the bag over the guardrail of the bridge on the Tallapoosa River, past the B.P. station in Bowdon, Georgia."
(C. 182-84.) On April 7 at 1:05 p.m., Waldrop gave a videotaped statement to law enforcement officers stating facts similar to those contained in the written statement.
*1165 Christy Waldrop ("Christy") testified that Waldrop is her brother. Christy stated that, in June 1998, she found a letter addressed to Clara and written in Waldrop's handwriting under a mattress at her father's house. According to Christy, because she did not want anyone to know she had removed the letter, she took only the first page of the letter to the police station. The letter, dated April 21, 1998, stated the following:
"Clara,
"Hey sweetheart. Well, we just got back from court. Look, we need to keep it like this. Let's don't change the story none except just tell them I done grandpa and you done grandma. Cause ask your lawyer that should be just manslaughter instead of capital murder cause I killed one and you killed one. But the way they got it now is we killed two people a piece, and look another thing you need to change is tell your lawyer you lied in your statement cause you were still messed up on crack. Tell them we didn't plan it. Tell them me and grandpa got in a fuss about some money I owed him. Okay, cause if they prove we plan[ned] it, it's called premeditated murder and we will get more time for that. So just tell your lawyer you was still high. Tell him we smoked about 80 dollars of crack the night before we got caught and tell your lawyer about them thrething [sic] you cause he can do something about that. Please tell them everything I've told you to and another thing don't let them find out about you hitting both of them with a frying pan cause then we can't say we just done one a piece. Cause all they know is what we tell them. I'll make sure I tell my lawyer you done one and I done one that way they will probably drop it down to manslaughter. Okay, and I've already told them that it wasn't planned, so you tell them, to[o]. Baby, I'm not trying to put it all on you. I'm just trying to help both of us cause I want us to be together again someday and have a wonderful life together. I just want us to start all over and be happy together. You know don't nobody wants us to be together when we get out, even you[r] mom and dad, but please don't listen to them. I'm not listening to my mom. I love you and you are the person that I want to be with so please promise me that you won't listen to them I'm so...."
(C. 189-90.)
Additionally, Christy testified that, on July 21, 1999, she gave Investigator Bailey a statement concerning a conversation she had had with Waldrop. Christy further testified that her signed statement contained the following:
"One day, I believe, it was the date of the funeral, and after that I went to the Randolph County Jail to visit Bobby Wayne Waldrop, my brother. The first thing he said, `Has [Irene] and [Sherrell] been buried yet?' And I told him that was just over. He, Bobby, asked did they get the rings back? Bobby showed me that on his right handBobby showed me a cut on his right hand and started in detail about how he had gotten it. He said [Sherrell] had tooken [sic] the knife from him and threw it down on the floor. He said [Sherrell] said for him to kill him if he had to because, he, [Sherrell], wasn't going to hurt him. I asked Bobby why did he killed [sic] [Irene]. Bobby said she would not shut up. That Clara killed her. Bobby started to tell me why it happened. He said that they went in and went to bed, he and Clara. [Sherrell] woke up and start[ed] fussing about some money that he, Bobby, owed. Bobby went to the kitchen and [Sherrell] followed him in there fussing.

*1166 [Sherrell] hit him. He putpicked up the knife and started to stab [Sherrell], and he knew he had went to far and he had to finish it. Bobby said after he had killed them, he went in and loaded the gun because he was going to kill himself, but Clara stopped him. He and Clara laid down on the bed and then they knew that they had to leave. They got [Sherrell]'s wallet out of his pocket. Bobbywhat [Irene] was saying, `Why are you doing this to us? We gave you the world. We love you.' And she told [Sherrell] that she loved him and that she would see him in heaven. Bobby said they got a bag out of the kitchen and put the knives and towels that were used to wipe their hands on and put them in the bag. He told Clara to throw it out the window going across some bridge. They had run out of gas on some dirt road and had slept there all night. The next morning they woke up scared and decided to run to Mexico. He decided to come back and face up to what he had done."
(R. 862-63.)
The record indicates that, on the morning of April 7, 1998, Waldrop and Clara went to Waldrop's mother's residence in Newnan, Georgia and were taken into custody by Georgia law-enforcement officers.
Gregory Wanger, a forensic pathologist, testified that he performed autopsies on the bodies of Sherrell Prestridge and Irene Prestridge. Wanger stated that Sherrell had sustained 43 stab and cut wounds to the head, neck, back, and chest, and that Irene had sustained 38 stab and cut wounds, including wounds to the heart and lungs.
Lilly Harper, a forensic scientist, testified that she compared the DNA from Waldrop's blood samples and the DNA obtained from a bloodstain found on wall in the Prestridge residence, a bloodstain on a bedspread obtained from the bedroom, and a bloodstain acquired from the kitchen floor. Harper stated that the DNA samples obtained from the wall, bedspread, and kitchen floor matched Waldrop's DNA. Additionally, Harper stated that the DNA test was 99.99% accurate.
Viewing the evidence in the light most favorable to the state, as we are required to do, we conclude that the State established a prima facie case of murder committed during a robbery in the first degree, and murder wherein two or more persons are murdered. Given that the evidence established that Waldrop and Clara had checked into a motel room before the murders occurred, that Waldrop stabbed both Sherrell and Irene with a knife, that Waldrop used gloves while he killed Irene, that Waldrop instructed Clara to take Sherrell's wallet, and that he fled the scene and disposed of the evidence, the State's evidence established that Waldrop intentionally murdered both Sherrell and Irene during a robbery in the first degree. Because a prima facie case of murders during a robbery, and of murder wherein two or more person are killed was established, the trial court did not err in denying Waldrop's motion for a judgment of acquittal.
Waldrop further argues that the evidence did not establish that the murders were committed during a robbery. Specifically, he argues that the theft of Sherrell's wallet occurred after the murders. (Waldrop's brief to this Court at p. 53.)
In Ex parte Roberts, 735 So.2d 1270 (Ala.1999), the Alabama Supreme Court stated:
"Although the taking of property committed after a murder and as a `mere afterthought' and unrelated to the murder will not sustain a conviction under § 13A-5-40(a)(2) for the capital offense *1167 of robbery-murder, see Bufford v. State, 382 So.2d 1162 (Ala.Cr.App.), cert. denied, 382 So.2d 1175 (Ala.1980), the question of a defendant's intent at the time of the commission of the crime is generally an issue for the jury to decide. Crowe v. State, 435 So.2d 1371, 1379 (Ala.Crim.App.1983). This Court held in Cobern v. State, 273 Ala. 547, 142 So.2d 869 (1962), that the fact that the victim was dead at the time the property was taken would not absolve a defendant of a charge of robbery if the intervening time between the murder and the taking of property was such as to permit the jury to find that the murder and the taking were links in a continuous chain of events. See Thomas v. State, 460 So.2d 207 (Ala.Crim.App.1983), aff'd, 460 So.2d 216 (Ala.1984). To hold any other way `would be tantamount to granting to would-be robbers a license to kill their victims prior to [taking their property,] in the hope of avoiding prosecution under the capital felony statute.' 460 So.2d at 212."
735 So.2d at 1276-77.
In this case, the jury could have found beyond a reasonable doubt that the robbery and murders were related events, and that Waldrop intended to murder Sherrell when he committed the robbery. See Roberts v. State, 735 So.2d 1244, 1264 (Ala. Crim.App.1997), aff'd, Ex parte Roberts, 735 So.2d 1270 (Ala.1999). Thus, the trial court did not err in determining that the State established a prima facie case of capital murder during a robbery.
Additionally, Waldrop argues that the trial court erred in considering his statements as evidence tending to establish a prima facie case, because, he says, the State had not presented independent evidence of the corpus delicti.
An extrajudicial confession is not admissible unless there is independent evidence to prove the corpus delicti of the offense charged. Slaton v. State, 680 So.2d 879 (Ala.Crim.App.1995). See generally, C. Gamble, McElroy's Alabama Evidence, § 200.13 (5th ed.1996). Circumstantial evidence may establish satisfactory proof of the corpus delicti of murder and robbery. Davis v. State, 536 So.2d 110 (Ala.Crim.App.1987).
The record indicates that there was overwhelming evidence introduced at trial to establish the corpus delicti of a robbery committed during a murder before Waldrop's statements were admitted. Coats testified that, around 1:00 p.m., on April 5, 1998, a man who identified himself as "Mr. Waldrop" and Clara pawned a riding lawnmower. (R. 367.) Rostefer testified that the lawnmower belonged to her father. Patel stated that, on April 5, 1998, at some time between 10:30 a.m. and 2:00 p.m., Clara and another person checked into an Anniston motel room. The record indicates that, at some time after 8:30 p.m. on the evening of April 5, 1998, Sherrell and Irene were killed. Nunn testified that during the morning or early afternoon of April 6, 1998, Waldrop had two wallets in his possession, and that she saw several $100 bills in one of the wallets. Nunn stated that, on April 6, 1998, Waldrop purchased approximately $500 worth of crack cocaine. Testimony indicated that, on April 7, 1998, in Newnan, Georgia, Waldrop and Clara were apprehended by the police. Harper testified that, in her opinion, the DNA contained in bloodstains acquired from the Prestridge's residence matched Waldrop's DNA. Thus, the trial court did not err in denying Waldrop's motion for judgment of acquittal.

VI.
Waldrop contends that his case was substantially prejudiced when the trial court *1168 commented to the jury concerning defense counsel's decision to waive closing argument. (Waldrop's Issue VII in his brief to this Court at p. 83.)
Our review of the record indicates that Waldrop has raised this issue for the first time on appeal. Thus, we will review Waldrop's allegations for plain error. Rule 45A, Ala.R.App.P.
During the sentencing phase of trial, the following transpired:
"THE COURT: Ladies and gentlemen, I'm going to let you go to the restroom and that sort of thing for just a minute, and then you'll come back and I'll instruct you on the law.
"(JURY OUT.)
"THE COURT: Okay. Any matters we need to take up outside the presence of the jury?
"MR. GILLENWATERS [defense counsel]: No, sir.
"THE COURT: We'll be in recess for probably 10 minutes and then I'll commence jury instructions. Since it is going to be about an hour long, we will have a brief recess now.
"I want to put something on the record because I think that it might be important for me to put this on the record. Let me say, without equivocation, that from the standpoint of the performance of defense counsel, I heartily approve his waiver of closing argument. I realize that might be something that he could be criticized for later on. However, at this stage, I am recording my thoughts right now before anything else happens, he had much more to lose than to gain by tendering arguments in support of his mitigating circumstances that would have allowed the district attorney to come back and deliver his thunder about the ridiculousness of a contention that because a person uses cocaine voluntarily, I violated the law of the State of Alabama, and therefore I ought to get away with murder, the smartest thing that defense counsel could have possibly have done in this case was to waive closing argument, and I don't want any New York lawyers jumping on his case about that. Because if this man doesn't get the death penalty, it is probably because he has had such outstanding representation in this case.

"(WHEREUPON, THERE WAS A 10-MINUTE RECESS.)
"(JURY PRESENT.)"
(R. 1051-53.) (Emphasis added.)
The record clearly indicates that the jury was not present during the trial court's comment concerning defense counsel's choice to waive closing argument during the sentencing phase of trial; therefore, the trial court's comment did not prejudice Waldrop, and we find no plain error. Cf. Griffin v. State, 790 So.2d 267 (Ala.Crim.App.1999) (where prosecutor's comment was made to the trial court outside the presence of the jury, the comment did not prejudice the defendant), rev'd on other grounds, 790 So.2d 351 (Ala.2000).

VII.
Waldrop contends that, because he initially pleaded not guilty by reason of mental disease or mental defect, the trial court erred in not ordering a mental evaluation to determine his competency to stand trial and his competency at the time that the offenses occurred. Specifically, he argues that, during a pretrial hearing, the trial court erred in asking him questions relating to his competency. (Issue IX in Waldrop's supplemental brief to this Court at p. 12.)
Waldrop did not raise this issue in the trial court. Therefore, we review the *1169 claim under the plain-error rule. See Rule 45A, Ala.R.App.
Our review of the record indicates that on December 9, 1998, the trial court ordered an outpatient mental evaluation to be conducted by a certified forensic medical examiner appointed by the Alabama Department of Mental Health and Retardation. (Supplemental Record filed with this Court on October 17, 2000, C.R. 22-24.) Furthermore, the record reveals that an outpatient psychological evaluation to determine Waldrop's competency was conducted by a certified forensic examiner, who was a clinical psychologist, on January 22, 1999. (Supplemental record filed with this Court on October 17, 2000, C.R. 2.) On or about January 27, 1999, a certified forensic examiner filed an outpatient forensic psychological evaluation report. (Supplemental record filed with this Court on October 17, 2000, C.R. 1-5.) In that report, the certified forensic examiner stated that, during the evaluation, Waldrop indicated that he knew he was charged with capital murder, and that he understood the role of the judge, the prosecutor, and defense counsel. The certified forensic examiner stated that, in his opinion, Waldrop "appear[ed] to be quite able to appraise available legal defenses and plan legal strategy to assist in his own defense." (Supplemental Record filed with this Court on October 17, 2000, C.R. 4.) Additionally, the certified forensic examiner stated:
"All the information available to me indicates quite clearly that at the time of the alleged offense of capital murder, Mr. Waldrop had a fairly lengthy history of dependence on crack cocaine and marijuana as well as narcotics. While he may have been voluntarily intoxicated at the time of the alleged offense, he was suffering no serious mental illness or mental defect that would render him incapable of understanding the nature and quality of his actions or the consequences of his behaviors."
(Supplemental record filed with this Court on October 17, 2000, C.R. 4.)
The record further indicates that, during a youthful offender hearing on January 7, 1999, the trial court asked Waldrop several questions relating to his understanding of the duties of the trial judge, the prosecutor, and defense counsel, and his understanding of the charges against him. (Supplemental record filed with this Court on April 7, 2000.) The record reveals that Waldrop's answers to the trial court's questions were coherent.
Given that the record indicates that an outpatient mental evaluation of Waldrop was conducted by a certified forensic medical examiner, Waldrop's claim that he was denied a mental evaluation is without merit. Furthermore, we find that, because a mental evaluation was conducted by a certified forensic examiner, any error in the trial court's questioning Waldrop during a pretrial hearing concerning his understanding of trial proceedings and of the charges against him was harmless. Rule 45, Ala.R.App.P.

VIII.
Waldrop maintains that his trial counsel was ineffective because, he says, trial counsel should have filed a motion to compel the trial court to order a mental evaluation. Additionally, Waldrop argues that trial counsel should have presented the testimony of a psychologist or psychiatrist concerning his mental state at the time of the offenses.
Waldrop raises these claims for the first time on appeal. Although Waldrop did not present the above allegations of ineffective assistance of counsel to the trial court, this Court is obliged to review his allegations pursuant to the *1170 plain-error doctrine, Rule 45A, Ala. R.App.P.
"In order to prevail on an ineffective assistance of counsel claim, a defendant must meet the two-pronged test set out by Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
"`First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is unreliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.'
"Id. at 687, 104 S.Ct. at 2064.
"`The performance component outlined in Strickland is an objective one: that is, whether counsel's assistance, judged under "prevailing professional norms," was "reasonable considering all the circumstances."` Daniels v. State, 650 So.2d 544, 552 (Ala.Cr.App.1994) (quoting Strickland, 466 U.S. at 688, 104 S.Ct. at 2065). Once a defendant has identified the specific acts or omissions that allegedly were not the result of reasonable professional judgment on counsel's part, the court must determine whether those acts or omissions fall outside the wide range of professionally competent assistance. Id.
"When reviewing a claim of ineffective assistance of counsel, we indulge a strong presumption that counsel's conduct was appropriate and reasonable. Hallford v. State, 629 So.2d 6 (Ala.Cr. App.1992), cert. denied, 511 U.S. 1100, 114 S.Ct. 1870, 128 L.Ed.2d 491 (1994); Luke v. State, 484 So.2d 531 (Ala.Cr. App.1985).
"`Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.'
"Strickland, 466 U.S. at 689, 104 S.Ct. at 2065 (citations omitted). See Ex parte Lawley, 512 So.2d 1370, 1372 (Ala.1987).
"And, even if an attorney's performance is determined to be deficient, the [appellant] is not entitled to relief unless it is also established that `there is a reasonable probability that, but for counsel's unprofessional error, the result *1171 of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine the confidence in the outcome.' Strickland, 466 U.S. at 694, 104 S.Ct. at 2068.
"In an ineffective assistance of counsel claim, the burden is on the claimant to show that his counsel's assistance was ineffective. Ex parte Baldwin, 456 So.2d 129 (Ala.1984), aff'd, 472 U.S. 372, 105 S.Ct. 2727, 86 L.Ed.2d 300 (1985)."
McNair v. State, 706 So.2d 828, 839 (Ala. Crim.App.1997), cert. denied, 523 U.S. 1064, 118 S.Ct. 1396, 140 L.Ed.2d 654 (1998).
As discussed earlier in this opinion, the record indicates that the trial court ordered a mental evaluation, and that a mental evaluation was, in fact, conducted by a certified forensic examiner. In that evaluation, the examiner, a clinical psychologist, stated that, in his opinion, Waldrop was competent to stand trial and that he did not suffer from a mental disease or defect at the time of the offense. We note that, although defense counsel did not present the testimony of a psychologist or a psychiatrist concerning Waldrop's mental competency, defense counsel did present the testimony of Dr. Tackett, a pharmacologist.
Our review of the record reveals that the error Waldrop alleges concerning his trial counsel's performance does not rise to the level of plain error. Given that a certified forensic medical examiner conducted a mental evaluation of Waldrop, and indicated that, in his opinion, Waldrop was competent at the time the offenses occurred, Waldrop's trial counsel's decision not to present testimony of a psychologist or a psychiatrist was consistent with sound trial strategy. Waldrop has not shown that trial counsel's performance was deficient and that the result of the proceeding probably would have been different but for trial counsel's challenged actions. Thus, we find no plain error in trial counsel's performance on the grounds raised by Waldrop.

Penalty-phase Issues

IX.
Waldrop argues that the trial court erred in instructing the jury during the sentencing phase that it was the duty of the jury members to listen to other jurors because, he says, the instruction affected the results of trial. (Waldrop's Issue VII in his brief to this Court at p. 83.) Specifically, he maintains that the trial court erred in instructing "if there is a recommendation for life without parole and two or three ... think there ought to be death, listen to them very carefully." (R. 1058.)
Our review of the record indicates that Waldrop has raised this issue for the first time on appeal. Thus, we will review Waldrop's allegations for plain error. Rule 45A, Ala.R.App.P.
In Williams v. State, 795 So.2d 753, 780 (Ala.Crim.App.1999), this Court stated:
"A trial court has broad discretion when formulating its jury instructions. See Williams v. State, 611 So.2d 1119, 1123 (Ala.Cr.App.1992). When reviewing a trial court's instructions, `"the court's charge must be taken as a whole, and the portions challenged are not to be isolated therefrom or taken out of context, but rather considered together." `Self v. State, 620 So.2d 110, 113 (Ala.Cr.App.1992) (quoting Porter v. State, 520 So.2d 235, 237 (Ala.Cr.App. 1987)); see also Beard v. State, 612 So.2d 1335 (Ala.Cr.App.1992); Alexander v. State, 601 So.2d 1130 (Ala.Cr.App. 1992)."
A trial court may instruct the jury as to its deliberative duty. See Ex parte *1172 Slaton, 680 So.2d 909, 926 (Ala.1996) (supplemental charge that jury should listen to each other's opinion was not error).
During the sentencing phase of trial, the trial court instructed as follows:
"Unlike the guilt phase of trial, unanimity is not required in the penalty phase. Ten votes are required in order to recommend death. At least seven votes are required in order to recommend life without parole. These numbers do not prevent the possibility of a hung jury.
"For instance, if you have five jurors who vote for life without parole and seven jurors who vote for death, that wouldn't be a verdict. But, that doesn't happen very often. You will likely be able to deliberate and come to some conclusion about the matter.
"Now, this is very important. Just because the matter can be determined by a vote, and you can fill in those blanks, does not in [any] way relieve you of the moral responsibility of carefully deliberating. If there are two people who are opposed to death, for instance, carefully consider their views even though you could just go ahead and reach a verdict, and put two in and ten in. Well, you talk about it for a while. You figure out why it is they think that there ought not to be a death penalty.

"Likewise, if there are two or three whoif there is a recommendation for life without parole and two or three think there ought to be death, listen to them very carefully. In other words, don't short circuit the process of deliberations because unanimity is not required. Go ahead and fully deliberate the matter and give everybody's views careful consideration. Don't pass over somebody's views simply because a less than unanimous verdict can be reached. If there are two people who are opposed to death, carefully hear their views. If there is one person who is opposed to death, carefully hear that person's views before you make a determination in this matter. Likewise, if there are only one or two persons who think the death penalty is appropriate, you should give their views careful consideration before reaching your verdict. Carefully deliberate the matter. It will be best if you could be unanimous in whatever decision you make. The law does not require that. However, due diligence, due deliberation, does require that you carefully consider all matters and the views of all jurors before you return a verdict in this case."
(R. 1058-59.) (Emphasis added.)
When viewing the instructions in context, it is clear that the trial court instructed the jury concerning its duty to listen to each member's opinion and to consider the views of other jurors before voting. Because the trial court did not suggest which way the verdict should be returned, Waldrop's case was not substantially prejudiced by the instruction. Thus, the trial court did not commit plain error in giving the instruction.
Furthermore, because the jury recommended that Waldrop be sentenced to life imprisonment without parole, any error in the trial court's instruction was harmless. Cf. Sockwell v. State, 675 So.2d 4, 36 (Ala.Crim.App.1993) (harmless error where, during the sentencing phase, prosecutor urged jury to consider inadmissible evidence as an aggravating circumstance and jury recommended life imprisonment without parole).

X.
Waldrop contends that the manner of execution inflicted by the State of Alabama constitutes cruel and unusual *1173 punishment. (Issue I in Waldrop's brief to this Court at p. 43.) However, this Court has held on numerous occasions that death by electrocution does not constitute cruel and unusual punishment.
In Griffin v. State, 790 So.2d at 346, this Court stated:
"`The United States Supreme Court addressed the death by electrocution issue in In re Kemmler, 136 U.S. 436, 10 S.Ct. 930, 34 L.Ed. 519 (1890). In determining what constitutes cruel and unusual punishments, the Court stated: "Punishments are cruel when they involve torture or a lingering death; but the punishment of death is not cruel within the meaning of that word as used in the constitution. It implies that there is something inhuman and barbarious,something more than the mere extinguishment of life." Id. at 447, 10 S.Ct. at 933. In holding that such a punishment is not cruel or unusual, the Court reasoned "that this act was passed in the effort to devise a more humane method of reaching the result." Id. Accord Spinkellink v. Wainwright, 578 F.2d 582, 616 (5th Cir.1978). Appellant's contention is therefore without merit; death by electrocution does not amount to cruel and unusual punishment per se, but is a constitutional means of imposing a sentence of death.'

"Jackson v. State, 516 So.2d 726, 737 (Ala.Cr.App.1985), remanded on other grounds, 516 So.2d 768 (Ala. 1986). See also Boyd v. Statel 715 So.2d 825 (Ala. Cr.App.1997)], supra; Sullivan v. Dugger, 721 F.2d 719 (11th Cir.1983); Lindsey v. Smith, 820 F.2d 1137, 1155 (11th Cir.1987), cert. denied, 489 U.S. 1059, 109 S.Ct. 1327, 103 L.Ed.2d 595 (Ala. 1989); Lowenfield v. Phelps, 817 F.2d 285 (5th Cir.1987); Stephens v. State, 580 So.2d 11, 26 (Ala.Cr.App.1990), aff'd, 580 So.2d 26 (Ala.1991), cert. denied, 502 U.S. 859, 112 S.Ct. 176, 116 L.Ed.2d 138 (1991); Thompson v. State, 542 So.2d 1286 (Ala.Cr.App.1988), aff'd, 542 So.2d 1300 (Ala.1989), cert. denied, 493 U.S. 874, 110 S.Ct. 208, 107 L.Ed.2d 161 (1989); Owens v. State, 531 So.2d 2 (Ala. Cr.App.1986).
"`There is an abundance of caselaw... that holds that the death penalty is not per se cruel and unusual punishment. Neither is electrocution, as a means of capital punishment, cruel and unusual punishment, in violation of the Eighth Amendment. Williams v. State, 556 So.2d 737, 741 (Ala.Cr. App.1986), aff'd in part, rev'd in part on other grounds, 556 So.2d 744 (Ala. 1987); Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972); Zant v. Stephens, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983); Boykin v. State, 281 Ala. 659, 207 So.2d 412 (1968), reversed on other grounds, Boykin v. State, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969).'

"Scott v. State, 728 So.2d 164, 171 (Ala. Cr.App.1997), aff'd, 728 So.2d 172 (Ala. 1999)."
790 So.2d at 346-47. See also Williams, supra, 795 So.2d at 776.
Accordingly, we reject Waldrop's contention that the manner of execution used by the State of Alabama constitutes cruel and unusual punishment.

XI.
Waldrop contends that the trial court abused its discretion in determining that the sentence of death is appropriate in his case. Specifically, he argues that his rights under the Fifth, Eighth, and Fourteenth *1174 Amendments of the United States Constitution were violated because, he claims, the mitigating circumstances in this case outweighed the aggravating factors. (Issue II in Waldrop's brief to this Court at p. 51.)
A defendant convicted of a capital offense is entitled to a sentencing hearing. §§ 13A-5-45 through -53, Ala.Code 1975. After the jury has returned an advisory verdict, the trial court must permit the parties to present arguments concerning the existence of aggravating and mitigating circumstances. § 13A-5-47, Ala.Code 1975.
Our review of the record indicates that the trial court found the existence of two statutory aggravating circumstances in Waldrop's case: (1) that the murders were committed during the course of a robbery in the first degree, see § 13A-5-49(4), Ala. Code 1975; and (2) that the murders were especially heinous, atrocious, or cruel when compared to other capital offenses, see § 13A-5-49(8), Ala.Code 1975. The trial court found the existence of two statutory mitigating circumstances: (1) that Waldrop had no significant history of prior criminal activity, see § 13A-5-51(1), Ala. Code 1975; and (2) that Waldrop was 19 years old at the time of the offenses, see § 13A-5-51(7), Ala.Code 1975. The trial court did not find the existence of any nonstatutory mitigating circumstances.
In Bush v. State, 695 So.2d 70 (Ala. Crim.App.1995), aff'd, 695 So.2d 138 (Ala.), cert. denied, 522 U.S. 969, 118 S.Ct. 418, 139 L.Ed.2d 320 (1997), this Court stated:
"`[T]he sentencing authority in Alabama, the trial judge, has unlimited discretion to consider any perceived mitigating circumstances, and he can assign appropriate weight to particular mitigating circumstances. The United States Constitution does not require that specific weights be assigned to different aggravating and mitigating circumstances. Murry v. State, 455 So.2d 53 (Ala.Cr.App.1983), rev'd on other grounds, 455 So.2d 72 (Ala.1984). Therefore, the trial judge is free to consider each case individually and determine whether a particular aggravating circumstance outweighs the mitigating circumstances or vice versa. Moore v. Balkcom, 716 F.2d 1511 (11th Cir.1983). The determination of whether the aggravating circumstances outweigh the mitigating circumstances is not a numerical one, but instead involves the gravity of the aggravation as compared to the mitigation.'
"Clisby v. State, 456 So.2d 99, 102 (Ala. Cr.App.1983)."
695 So.2d at 94.

A.
Additionally, Waldrop contends that the trial court incorrectly determined that the murders occurred during the commission of a robbery. (Issue II(A)(i) in Waldrop's brief to this Court at p. 56.) Specifically, he argues that the trial court's ruling was not supported by the evidence.
Section 13A-5-45(e), Ala.Code 1975, states:
"At the sentence hearing the state shall have the burden of proving beyond a reasonable doubt the existence of any aggravating circumstances. Provided, however, any aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentence hearing."
See Price v. State, 725 So.2d 1003, 1056 (Ala.Crim.App.1997) (the jury, by its verdict of guilty of the capital offense of *1175 murder during a robbery, finds the aggravating circumstance encompassed in the indictment to exist beyond a reasonable doubt); Maples v. State, 758 So.2d 1 (Ala. Crim.App.1999); Williams v. State, 710 So.2d 1276, 1303 (Ala.Crim.App.1996) (trial court correctly instructed the jury that the aggravating circumstance that the capital offense was committed while the defendant was engaged in committing a robbery or attempting to commit a robbery had been proven by virtue of the jury's guilty verdict for murder-robbery); Gaddy v. State, 698 So.2d 1100, 1140-41 (Ala.Crim.App.1995), aff'd, 698 So.2d 1150 (Ala.), cert. denied, 522 U.S. 1032, 118 S.Ct. 634, 139 L.Ed.2d 613 (1997). See also § 13A-5-50, Ala.Code 1975.
During the guilt phase of trial, the jury found Waldrop guilty of the capital offense of murders committed during a robbery in the first degree. By virtue of the verdict during the guilt phase of trial, the jury determined that the murders had occurred during a robbery in the first degree. Thus, the aggravating factor that the murders were committed during a robbery was sufficiently supported by the evidence produced at trial; the trial court did not err in this regard.

B.
Waldrop also argues that the trial court's determination that the offense was especially heinous, atrocious, or cruel as compared to other capital offenses was unsupported by the evidence and that it violated established law. (Waldrop's brief to this Court at p. 57.) This contention is discussed within Part XIII of this Court's opinion.

C.
Waldrop maintains that the trial court's determination that his cocaine addiction was not evidence of a mental imbalance or an emotional imbalance and that it did not impair his ability to appreciate the criminality of his conduct at the time of the offense was contrary to the weight of the evidence and contrary to a prior ruling by the Court.
In its revised sentencing order, the trial court determined the following:
"The defendant strongly contends that because he is a cocaine addict, he did not appreciate the criminality of his conduct. He further contends that his ability to conform his conduct to the requirements of law was substantially impaired. Dr. Tackett testified that crack cocaine changes brain chemistry. He testified that the drug is addictive. He explained addiction by testifying that `in an addictive state, your body has adapted to where it needs the drug and the body considers having the drug present as normal functioning. So, that when the drug starts disappearing, the body starts rebelling in the sense of something that it thinks is normal, which [is] the crack cocaine, is missing; and, so, that changes people's behaviors.' He went on to testify, `Your body normally has or your mind has several core values, and when a person becomes impaired, addicted with a substance of abuse, what happens is those core values get swapped out for the drug because it changes the brain chemistry.'
"Defense counsel asked the following questions and received the following answer:
"Q: Now, let me ask you about whether or not in your opinion he could appreciate the criminality of his conduct and conform his conduct to the requirements of the law; in other words, was he substantially impaired back on April 5 of 1998?
"A: I believe so.

*1176 "On direct examination, Dr. Tackett went on to express the opinion that cocaine addiction is a disease. Dr. Tackett did not testify that the defendant lacked the capacity to appreciate the criminality of his conduct. Now that this court had the opportunity to review the transcript of Dr. Tackett's testimony, this court also realizes that Dr. Tackett never testified that the defendant's ability to conform his conduct to the requirements of law was substantially impaired, although that inference can be drawn from the entirety of his testimony. The question that was actually put to Dr. Tackett was whether the defendant was substantially impaired.
"This court was mistaken in the finding expressed in the original sentencing order that the defendant's ability to conform his conduct to the requirements of law was substantially impaired. The conclusion that the court was mistaken in its earlier finding is not based merely on an inartfully phrased question from defense counsel which resulted in an ambiguous answer from Dr. Tackett. The conclusion would be necessary even if Dr. Tackett had directly testified that the defendant's capacity to conform his conduct to the requirements of law was substantially impaired. Taken in its entirety, Dr. Tackett's testimony is sufficient to make it clear that he thought that the defendant's ability to conform his conduct to the requirements of law was substantially impaired. Dr. Tackett's opinion in this regard is rebutted by the entirety of the evidence. The entirety of the evidence in this case clearly does not support a finding that the defendant lacked the capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law. He acted with purpose and intent to achieve deliberately formed goals. He knew that his conduct was criminal conduct as evidenced by his flight and attempts to conceal evidence pertaining to the crime.
"The essence of Dr. Tackett's testimony, both during the guilt phase and the penalty phase of the trial, suggests that the behavior of a cocaine addict is reduced to a mechanical effort to obtain cocaine. However, in the present case, the defendant engaged in complex behavior that evidenced an awareness of the criminal nature of his activities and an ability to choose alternatives. In the guilt phase of the trial, Dr. Tackett gave a lengthy narrative response to the question, `What is the effect of crack cocaine on the body?' that concluded with the following assertion:
"`We do know that cocaine can create such a craving that it becomes almost the number one thing in a person's life. The best experiment that I know that we use to demonstrate this to our students is, if you were to take a bunch of rats and give them cocaine, they will literally starve themselves to death trying to take the cocaine. So, as long as the cocaine is available, whether it is crack or regular cocaine, they will keep hitting the bar to get more cocaine and ignore food completely. And, so, it is a very reinforcing drug. Which means, as you start coming off of it, your body is saying it needs more of it and that becomes the single focus in your life.'
"Unlike the rats in Dr. Tackett's experiment, who mechanically satisfy their craving for cocaine as opposed to eating, Bobby Waldrop continued at all times to make deliberate decisions. Moreover, the decision to kill did not mechanically result in the satisfaction of the cocaine addiction. The killings were intentional. He could have stolen the money without the killing. After he had killed his *1177 grandfather, he could have taken the money without killing his grandmother. Bobby Waldrop did not kill Clara Waldrop so that he could have more cocaine. Our court system deals with thousands of cocaine users, and the percentage of those who commit murder to acquire cocaine is very low. The conclusion is inescapable that addiction to cocaine does not substantially impair the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law. Although the defendant may have committed the killings in this case in order to obtain the money to buy cocaine, the choice to kill was deliberate, and the defendant at all times appreciated the criminality of his conduct and had ample capacity to conform his conduct to the requirements of law. Statutory mitigating circumstance no. 6 does not exist in this case."
(Trial court's revised sentencing order at pp. 9-12.)
It is clear from a review of the record that the trial court understood its duty to consider the evidence presented and that it did not abuse its discretion in finding that the statutory mitigating circumstance that Waldrop, at the time of the offense, did not have the capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law, did not exist. See McWhorter v. State, 781 So.2d 257 (Ala.Crim.App.1999). The record supports the trial court's finding. See Madison v. State, 718 So.2d 90 (Ala.Crim. App.1997).

XII.
Waldrop contends that the trial court "erred in refusing to consider cocaine addiction as a nonstatutory mitigating factor." (Issue XII in Waldrop's Supplemental brief to this Court at p. 23.)
Waldrop did not raise this issue to the trial court. Therefore, we review the claim under the plain-error rule. See Rule 45A, Ala.R.App.
In Reeves v. State, 807 So.2d 18 (Ala. Crim.App.2000), this Court addressed what a trial court must do when considering nonstatutory mitigating circumstances. At sentencing, Reeves had raised several nonstatutory mitigating circumstances, including an allegedly low intelligence level. Although the trial court specifically addressed two nonstatutory mitigating circumstances in its sentencing order, the trial court did not address Reeves's intelligence level as a nonstatutory mitigating circumstance. This court held that, because the trial court addressed Reeves's intelligence level when determining whether the statutory mitigating circumstance of "the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired" existed, the trial court had complied with the law. Reeves v. State, supra. In Reeves, this Court stated:
"`"[T]he trial court is not required to specify in its sentencing order each item of proposed nonstatutory mitigating evidence offered that it considered and found not to be mitigating. Morrison v. State, 500 So.2d 36 (Ala. Cr.App.1985), aff'd, 500 So.2d 57 (Ala. 1986), cert. denied, 481 U.S. 1007, 107 S.Ct. 1634, 95 L.Ed.2d 207 (1987)."'

"Wilson v. State, 777 So.2d 856, 892 (Ala.Crim.App.1999), quoting Williams v. State, 710 So.2d 1276, 1347 (Ala.Crim. App.1996), aff'd, 710 So.2d 1350 (Ala. 1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998). The fact that the trial court does not list and make findings in its sentencing order as to each alleged nonstatutory mitigating circumstance offered by a defendant indicates *1178 that the trial court found some of the offered evidence not to be mitigating, not that the trial court did not consider this evidence. See, e.g., Ingram v. State, 779 So.2d 1225 (Ala.Crim.App. 1999)."
807 So.2d at 48.
The revised sentencing order in this case indicates that the trial court considered all of the mitigating evidence Waldrop offered. In its revised sentencing order, the trial court addresses each statutory mitigating circumstance and makes specific findings of fact as to each circumstance. In the portion of the sentencing order where the trial court discusses its reasoning for not finding as a statutory mitigating circumstance that "the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired," the trial court states that it had considered Waldrop's addiction to crack cocaine. (Trial court's revised sentencing order at pp. 9-12.) Additionally, in the portion of the revised sentencing order addressing the statutory mitigating circumstance that the offenses were "committed while the defendant was under the influence of extreme mental or emotional disturbance," the trial court addresses Waldrop's "voluntary chemical addiction." (Trial court's revised sentencing order at p. 8.)
The fact that the trial court did not list and make findings in its revised sentencing order as to the alleged nonstatutory mitigating circumstance relating to a crack-cocaine addiction indicates that the trial court did not find that evidence to be mitigating, not that the trial court did not consider the evidence. See Reeves, supra. Based on the foregoing, we find no error, plain or otherwise, in the trial court's findings regarding the nonstatutory mitigating circumstance that Waldrop was addicted to crack cocaine.

XIII.
In accordance with Rule 45A, Ala.R.App. P., we have examined the record for any plain error with respect to Waldrop's capital murder convictions and death sentence, whether or not brought to our attention or to the attention of the trial court. We find no plain error or defect in either the guilt phase or the sentencing phase of Waldrop's trial.
We have also reviewed Waldrop's sentence in accordance with § 13A-5-53, Ala.Code 1975, which requires that, in addition to reviewing the case for any error involving Waldrop's capital murder convictions, we also review the propriety of the death sentence. In making our determination, we must answer the following: (1) whether any error adversely affecting the rights of the defendant occurred in the sentence proceedings; (2) whether the trial court's findings concerning the aggravating circumstances and the mitigating circumstances were supported by the evidence; and (3) whether death is the appropriate sentence in this case. Section 13A-5-53(b) requires that, in determining whether death is the proper sentence, we ascertain: (1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; (2) whether an independent weighing by this court of the aggravating and mitigating circumstances indicates that death is the proper sentence; and (3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
After the jury convicted Waldrop of the capital offenses charged in the indictment, a separate sentence hearing was held before the jury in accordance with §§ 13A5-45 *1179 and -46, Ala.Code 1975. After hearing evidence concerning the aggravating circumstances and the mitigating circumstances, after being properly instructed by the trial court as to the applicable law, and after being correctly advised as to its function in reference to the finding of any aggravating and mitigating circumstances, the weighing of those circumstances, and its responsibility in returning an advisory verdict, the jury recommended, by a vote of 10-2, life imprisonment without parole.
Thereafter, the trial court held another hearing, in accordance with § 13A-5-47, Ala.Code 1975, to determine whether it would sentence Waldrop to death or to life imprisonment without the possibility of parole, as the jury recommended. The trial court ordered and received a written presentence investigation report, as required by § 13A-5-47(b). After the hearing, the trial court entered specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in § 13A-5-49, Ala.Code 1975, each mitigating circumstance enumerated in § 13A-5-51, Ala.Code 1975, and any nonstatutory mitigating circumstance found to exist under § 13A-5-52, Ala.Code 1975, as well as written findings of fact summarizing the offense and Waldrop's participation in the offense.
In its findings of fact, the trial court found the existence of two statutory aggravating circumstances: (1) that the murders were committed while Waldrop was engaged in or was an accomplice in the commission of, or an attempt to commit, or flight after committing, or attempting to commit, a robbery, see § 13A-5-49(4); and (2) that the capital offense was especially heinous, atrocious, or cruel compared to other capital offenses, see § 13A-5-49(8), Ala.Code 1975. With regard to its finding that the capital offense was especially heinous, atrocious, or cruel compared to other capital offenses, the trial court stated:
"The State proved this to be an aggravating circumstance. The defendant and his co-defendant entered the victims' home, stabbed the victims and slit the victims' throats. According to the medical examiner, Sherrell Prestridge had 43 stab and cut wounds to the head, neck, back and chest. Irene Prestridge had 38 stab and cut wounds. The evidence indicated that Sherrell had heart and hip problems and had difficulty walking. Irene was blind and bed-ridden. Because of their infirmities, the living room of their house had been converted to a bedroom with two hospital beds where they slept. He repeatedly stabbed and cut both victims. He killed his grandfather by stabbing him to death in the presence of his grandmother. Testimony indicated that Irene was screaming loudly throughout the incident. During a videotaped statement, Waldrop stated that, before he stabbed Irene, she told him that she loved him. The evidence also indicated that Christy Waldrop, Waldrop's sister, made a statement to the police in which she said Waldrop told her that, during the incident, Irene told Sherrell that she loved him and that she would see him in heaven. He then killed his grandmother by repeatedly stabbing and cutting her. He unnecessarily inflicted physical and psychological pain on both victims. Evidence indicating the intentional killing of more than one victim in each other's presence has long been held to support a finding that the murders were especially heinous, atrocious, and cruel. In this case, no speculation at all is required to find the existence of this aggravating circumstance. The evidence in this case is that the only victim capable of defending himself, namely, Sherrell Prestridge, was attacked first and that he fought his *1180 assailant in a violent struggle taking place only inches away from his wife as she lay helpless in a hospital bed. The evidence is that even the blind victim, Irene Prestridge, was aware of what was happening, first to her husband and then to herself. The evidence was supplied by the defendant's own statement and it was self-evident from the physical evidence at the crime scene. He chose the method of killing and deliberately carried it out. The court finds that the actions of the defendant were cruel and heinous and that they were intended to inflict pain on the victims. The crime was objectively atrocious."
(Trial court's revised sentencing order at pp. 6-7.)
The determination of the trial court is supported by a record that more than adequately establishes that, when compared to other capital offenses, the capital murders in this case were especially heinous, atrocious, or cruel. See Price v. State, 725 So.2d 1003 (Ala.Crim.App. 1997) (where evidence indicated that the victim was repeatedly stabbed with a knife, and witnessed an attack on his spouse, the offense was especially heinous, atrocious, or cruel); Barbour v. State, 673 So.2d 461 (Ala.Crim.App.1994) (where evidence indicated that the victim moaned after she was stabbed and suffered before her death, the offense was especially heinous, atrocious, or cruel); Ashley v. State, 651 So.2d 1096 (where evidence indicated that the victim was stabbed in the chest as he slept and, as he jumped out of bed, was stabbed in the back, the offense was especially heinous, atrocious, or cruel).
The trial court found the existence of two statutory mitigating circumstance: 1) Waldrop's age (he was 19 years old) at the time of the crime, see § 13A-5-51(7), Ala. Code 1975; and 2) the fact that Waldrop had no significant history of prior criminal activity, see § 13A-5-51(1), Ala.Code 1975. The trial court did not find the existence of any nonstatutory mitigating circumstances.
The trial court's sentencing order reflects that after considering all the evidence presented, the arguments of counsel, the presentence report, the advisory verdict of the jury, and after weighing the aggravating circumstances against any statutory and nonstatutory mitigating circumstances, the court determined that the aggravating circumstances outweighed the mitigating circumstances. Accordingly, the trial court properly sentenced Waldrop to death. We conclude that the trial court's findings concerning the aggravating circumstances and the mitigating circumstances are supported by the evidence.
Waldrop was convicted of two counts of murder committed during a robbery in the first degree, and one count of murder wherein two or more persons are murdered pursuant to one scheme or course of conduct. These offenses are defined by statute as capital offenses. See §§ 13A-5-40(a)(2), 13A-5-40(a)(10), Ala.Code 1975. We take judicial notice that similar crimes have been punished capitally throughout the state. See, e.g., Melson v. State, 775 So.2d 904 (Ala.2000) (murder made capital because it was committed during the course of a robbery; murder made capital because two or more persons were murdered); Ferguson v. State, 814 So.2d 925 (Ala.Crim.App.2000) (murder made capital because it was committed during the course of a robbery; murder made capital because two or more persons were murdered); Maxwell v. State, 828 So.2d 347 (Ala.Crim.App.2000) (murder made capital because it was committed during the course of a robbery; murder made capital because two or more persons were murdered); Freeman v. State, 776 So.2d 203 (Ala.2000) (murder made capital because it was committed during the course of a *1181 rape; murder made capital because it was committed during the course of a burglary; murder made capital because it was committed during the course of a robbery; and murder made capital because two or more persons were murdered pursuant to one course of conduct); Ex parte Williams, 710 So.2d 1350 (Ala.1997) (murder made capital because it was committed during the course of a robbery; murder made capital because two or more persons were murdered); Wright v. State, 593 So.2d 111 (Ala.Crim.App.1991) (murder made capital because it was committed during the course of a robbery; murder made capital because two or more persons were murdered); Fortenberry v. State, 545 So.2d 129 (Ala.Crim.App.1988) (murder made capital because it was committed during the course of a robbery; murder made capital because two or more persons were murdered); and Hooks v. State, 534 So.2d 329 (Ala.Crim.App.1987) (murder made capital because it was committed during the course of a robbery; murder made capital because two or more persons were murdered).
After carefully reviewing the record of the guilt phase, the penalty phase, and the sentencing phase of Waldrop's trial, we find no evidence that the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor. We conclude that the findings and conclusions of the trial court are abundantly supported by the evidence. We have independently weighed the aggravating circumstances against the statutory and nonstatutory mitigating circumstances, and we concur in the trial court's judgment that death is the appropriate sentence in this case. Considering the crimes committed by Waldrop, we find that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases.
Waldrop's convictions and his sentence of death are affirmed.
AFFIRMED.
LONG, P.J., and McMILLAN, COBB, and BASCHAB, JJ., concur.
NOTES
[1] The trial court found that the capacity of Waldrop to conform his conduct to the requirements of the law was substantially impaired did exist, but accorded this mitigating circumstance little weight. See discussion in Part III.B., infra. However, the trial court found that the capacity of Waldrop to appreciate the criminality of his conduct did not exist. (C. 167-68.)
[1] While this cause was on remand, this Court was informed that appellate counsel did not have the five years' experience required before an attorney can represent an indigent defendant in a capital case.

Section 13A-5-54, Ala.Code 1975, states:
"Each person indicted for an offense punishable under the provisions of this article who is not able to afford legal counsel must be provided with court appointed counsel having no less than five years' prior experience in the active practice of criminal law."
We interpret § 13A-5-54, Ala.Code 1975, to apply to appellate counsel, as well as to trial counsel.
In an effort to avoid potential problems and after a return to remand was made, this Court appointed new appellate counsel to represent Waldrop on appeal. Appellate counsel was then given an opportunity to file a supplemental brief and to raise any additional issues; the State was also given an opportunity to respond to these issues. Appellate counsel adopted former appellate counsel's brief and raised three additional issues in a supplemental brief to this Court. The state did not file a brief responding to the additional issues raised by appellate counsel.
In certain situations, the State's failure to file a brief in response to contentions raised by an appellant indicates that the State concedes error. See Faulkner v. State, 741 So.2d 462 (Ala.Crim.App.1999) (where State failed to respond to ineffective-assistance-of-counsel claim, this Court must accept the appellant's claim as true); Davis v. State, 654 So.2d 49 (Ala.Crim.App.1994) (where state did not respond to the appellant's petition for post-conviction relief, this Court is bound to accept the allegations raised by the appellant as true); cf. Robinson v. State, All 477 So.2d 981 (Ala.Crim.App.1985) (where attorney general declined to file a brief and conceded error, this Court reversed the judgment of the trial court). However, in this case, because the issues raised in the supplemental brief are directly refuted by the record or are without merit, we do not find error.
[2] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[3] Although we do not find reversible error in this case, we can conceive of situations where the destruction of such notes could cause reversible error. We caution investigators and other law-enforcement officers to avoid the practice of destroying notes taken during the taking of a statement or during an interview of a suspect.
[4] Donnie Payne, an investigator for the Coweta County, Georgia, sheriff's office, testified that he assisted in taking Waldrop into custody at his friend's mobile home, but that he did not arrest Waldrop. On cross-examination, he testified that he "presumed" other officers arrested Waldrop at that time. Investigator Wheeles, however, testified that Waldrop was not arrested until after Waldrop made his statement to the police. Even though we are uncertain as to when Waldrop was formally arrested, the record is clear that when Officer Payne seized Waldrop, he was not free to leave.